**TOM'S FOODS INC., Plaintiff,**

v.

**Richard E. LYNG, Secretary of The United States Department of Agriculture; Milton J. Hertz, Executive Vice President, Commodity Credit Corporation; and Commodity Credit Corporation, Defendants.**

**Civ. A. No. 88–47–COL.**

United States District Court, M.D. Georgia, Columbus Division.

Jan. 10, 1989.

Alan F. Rothschild of Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., and Stephen O. Kinnard of Hansell & Post, Atlanta, Ga., for plaintiff.

Jack Hood, Asst. U.S. Atty., Macon, Ga., and Terrence G. Jackson, Office of Gen. Counsel, U.S. Dept. of Agr., Washington, D.C., for defendants.

## OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ELLIOTT, District Judge.

### Background

Tom's Foods Inc. ("Tom's") is a company based in Columbus, Georgia, which has manufactured and distributed various food products in the southeastern United States for more than 60 years. Some of these products contain peanuts, the purchase and transfer of which are subject to the Federal Price Support Program and the regulations promulgated thereunder by the United States Department of Agriculture ("USDA"). *See* Agricultural Adjustment Act of 1938, *amended by* 7 U.S.C. §§ 1281–1393 (1982); Agricultural Adjustment Act of 1949, *amended by* 7 U.S.C. §§ 1421–1469 (1982); 7 C.F.R. §§ 1446.1–.148 (1988).

Tom's is a "handler" of peanuts as designated in 7 C.F.R. § 1446.52(w) and handlers are registered and qualified with the Agricultural Stabilization Conservation Service ("ASCS") "for the purpose of acquiring peanuts for resale, domestic consumption,

exportation, and crushing, through a business of buying and selling peanuts."

The federal government has regulated the growing, handling, and selling of peanuts in the United States since the enactment of the Agricultural Adjustment Act in 1938, and the Commodity Credit Corporation ("CCC"), an agency of the USDA, has promulgated these regulations, and the CCC assessed a penalty of $533,065.59 against Tom's because of Tom's alleged failure to dispose of certain peanuts in conformity with regulations.

Tom's filed this action seeking judicial review of the final administrative action of the USDA that affirmed the assessment and requests that the Court issue a judgment declaring the penalty assessed against Tom's void and unenforceable because: (1) Tom's complied with all applicable federal regulations; (2) the assessment of the penalty was not supported by substantial evidence; and (3) the Defendants above named are equitably estopped from assessing the penalty against Tom's.

In response the Defendants have asserted a counterclaim against Tom's and the Plaintiff and the Defendants have filed their respective motions for summary judgment.

There appears to be no substantial controversy concerning the material facts, and summary disposition is therefore appropriate.

### The Facts

Initially, the regulation of peanuts was based upon acreage allotment. Congress amended the Agricultural Adjustment Act in 1977 to change the basis of regulation from acreage allotment to poundage quotas which were allocated to farms with acreage allotments. The advent of "quota" poundage brought about the characterization of peanuts grown in the United States into two basic categories: "quota" peanuts and "additional" peanuts. 7 C.F.R. § 1446.52.

With some exceptions, not relevant to the issues in this case, only "quota" peanuts may be used in the United States. Handlers must dispose of all "additional" peanuts acquired by them by crushing or ex-

portation by August 31 of the year following the calendar year in which the crop was grown unless the handler obtains an extension and a handler's failure to crush or export a dollar value of peanuts equivalent to the dollar value of "additional" peanuts purchased in that crop year subjects the handler to a penalty. 7 C.F.R. § 1446.59. The penalty may be reduced in certain circumstances.

Tom's acquired 3,020,875 pounds of "additional" peanuts from the 1985 crop that had a dollar value of $860,603.69 and federal-state personnel inspected these "additional" peanuts handled by Tom's and accounted for the peanuts on a dollar-value basis, all as contemplated by the regulations.

In the late summer of 1985 Tom's determined that it needed more "quota" peanuts than it had available for its manufacturing operations and during that same period Columbian Peanut Company ("Columbian"), another handler of peanuts, determined that it needed more "additional" peanuts than it had to comply with its export obligations. In order to satisfy their respective needs Tom's and Columbian executed a letter agreement in late September 1985 which contained the following terms:

(1) Tom's will purchase from producers, up to 1500 farmer stock net tons of runner contract additional peanuts at Tom's buying points. Such purchases shall be at prices furnished by Columbian which shall be Columbian's prices for unpriced contract additionals in effect at the time of delivery to Tom's buying points.

(2) Prior to January 31, 1986, Tom's will transfer such peanuts to Columbian by ASCS–1006, with Columbian accepting the export obligation upon approval by the GFA Peanut Association (GFA) of the ASCS–1006. The ASCS–1006 shall be supported by Tom's furnishing Columbian copies of the ASCS–1007's covering such peanuts.

(3) Within 15 days of GFA's approval of the ASCS–1006, Tom's shall pay Co-

lumbian the difference between the actual percentage of runner quota support price, basis grade, paid to the producers and 100% of runner quota support price, basis grade, plus $15.00 per net ton.

(4) It is the intent of this trade for Tom's to "swap" contract additional peanuts to Columbian in exchange for quota peanuts from Columbian through appropriate paper work and a mutually agreeable payment in cash to Columbian as set forth above, but without the necessity for any physical movement of peanuts to effect such swap.

It is obvious that the parties were agreeing to exchange peanuts of the same grade, quality, and quantity by agreeing to exchange only the regulatory obligation of their respective peanuts, thus avoiding unnecessary shipping costs.

The Georgia–Florida–Alabama Peanut Association ("GFA") is an area marketing association designated by the CCC to be responsible for providing administrative and supervisory support to the CCC in the administration of the Price Support Program.

At the end of October 1985 Tom's "bailed out" under GFA supervision one-third of its "additional" peanuts in accordance with 7 C.F.R. § 1446.58. It "bailed out" only one-third of its "additional" peanuts because it had agreed to transfer the regulatory obligation of the other two-thirds of its "additional" peanuts to Columbian in accordance with the contract and upon approval of the transfer by the GFA.

James Godwin is the Assistant Manager of the GFA, and in December 1985 he inquired of Tom's why Tom's had not finished shelling out its obligations, and Alvin Meyer, a supervisor at Tom's, explained to Godwin that Tom's had not finished shelling out its obligation because Tom's had an agreement with Columbian whereby Columbian would finish shelling Tom's obligation of contract "additional" peanuts and Godwin verbally approved Columbian's completion of the shelling obligations.

Prior to this time representatives of Tom's had spoken with Godwin about the proposed transaction with Columbian and the evidence shows that Godwin admits that prior to the 1985 crop harvest Tom's informed him that Tom's wanted to avoid the physical movement of both "additional" peanuts to Columbian and "quota" peanuts from Columbian to Tom's and during these conversations between Tom's and the GFA Godwin never informed Tom's that the regulations required a physical transfer of the peanuts.

The GFA has a long-standing history of advising peanut handlers regarding compliance procedures and Tom's, over a period of years, has routinely contacted the GFA if it had any questions regarding the proper procedures for compliance with the regulations.

On or about February 18, 1986, Tom's submitted to the GFA what is identified as its "contract 1006" covering approximately 1,937,600 pounds of "additional" peanuts and shortly after receipt of this document and prior to granting approval of the transfer Patricia Huey of the GFA called Tom's and requested that Tom's send to GFA a "Form 1007" covering the peanuts involved in the transaction. During this conversation Webster Hix, a representative of Tom's, explained to Huey that Tom's and Columbian had agreed to only a paper swap of obligations. Later that same day Alvin Meyer of Tom's called Huey and again explained the substance of the proposed transaction between Tom's and Columbian and Hix stated that she would talk with Godwin and get back to Tom's if they had any problems with the transaction. Thereafter no representative of the GFA ever contacted Tom's and told Tom's that it had any problem with the transaction.

In a letter dated March 11, 1986, Charles F. Coker, the Manager of GFA, wrote to Mr. Hix of Tom's approving the transfer request for the contract "additional" peanuts and a copy of that letter was sent to Columbian. Since Tom's had explained the transaction to the GFA and the GFA never contacted Tom's further about the transaction and the Manager of GFA wrote the approval letter above referred to Tom's had no reason to believe that GFA or any other

governmental authority had any problem with the exchange so Tom's completed its exchange with Columbian and made payment of the cash portion of the purchase price ($367,441.16) to Columbian, and the record in this matter contains an affidavit of the Procurement Manager of Columbian that Columbian in turn performed all acts required under the applicable regulations with respect to these "additional" peanuts by grading them out under GFA supervision and exporting them.

Relying upon GFA's approval of the arrangement, Tom's did not request supervision to grade out the "additional" peanuts that were previously put on its export obligation because the regulatory obligation to grade out these peanuts had been exchanged with Columbian. If the GFA or CCC had raised any objection to the transaction at the time approval of the exchange was sought, Tom's and Columbian could have cancelled the transaction and each could have graded out its own peanuts under supervision, and if the GFA had objected even as late as July, 1986 Tom's still could have graded out a sufficient amount of peanuts to avoid any penalty. However, in light of the approval previously given by the GFA and because no objection was made by anyone until after Tom's had completed its shelling for 1986, Tom's sought no further supervision.

Neither the CCC nor the GFA raised any question concerning the transaction until August 1986. After being informed by Columbian that there was a potential problem with the transaction, Ben Smith, Tom's Manager of Peanut Operations, contacted Dallas Smith, Contracting Officer of the CCC, in August 1986 and explained to the CCC that the reason that Columbian graded out an additional amount of "additional" peanuts in excess of its export obligation and Tom's failed to grade out a like amount of peanuts was because the companies had exchanged their obligations with GFA approval. Tom's heard nothing further from Dallas Smith until December 29, 1986, when it received a letter from him advising Tom's that the USDA had assessed a penalty of $640,432.16 against it because of Tom's "failure to grade out of commingled

warehouse storage under supervision 1,833,624 (converted) pounds of farmers stock runner peanuts."

### The Alleged Violations

Defendants charged in their assessment letter that Tom's violated 7 C.F.R. § 1446.57(d) (1988), which requires that "contract additional peanuts be inspected on a farmers stock basis and accounted for on a dollar value basis less a one-time adjustment for shrinkage." Second, Defendants charged that Tom's violated § 1446.58 (1988), which requires that handlers arrange for and that "the area association will conduct onsite supervision of domestic handling of contract additional peanuts including storing, shelling, crushing, cleaning, milling, blanching, weighing, and shipping." Third, Defendants charged that Tom's violated § 1446–57(e), which requires that handlers dispose of all contract additional peanuts by export, crushing, or substitutions by the specified date, in accordance with the requirements and procedures of § 1446.58.

### The Administrative Appeal

Tom's then pursued an administrative appeal by submitting a Request for Reconsideration of the penalty, which request was eventually denied by Dallas Smith. Tom's then appealed this decision to the Defendant Milton J. Hertz (Hertz), who is the Executive Vice President of CCC, and on April 7, 1987, the USDA held a hearing on the record concerning Tom's appeal of the penalty. At the hearing Tom's presented evidence that it had complied with the regulations which the Defendants contended applied to the transaction; that the GFA was well aware of and had no objection to the transaction between Tom's and Columbian; and that the transaction did not harm the Peanut Price Support Program. Subsequent to the hearing the USDA sent a copy of the transcript for comment to Godwin and Huey, the GFA personnel who Tom's contended were aware that the transaction between Tom's and Columbian would involve only an exchange of regulatory obligation and not a physical exchange of pea-

nuts, and neither Godwin nor Huey disputed Tom's contention in any material respect in statements signed by them after their review of the transcript.

On January 28, 1988, Hertz affirmed the determination that Tom's violated the regulations which the Defendants contend apply to the transaction, but he reduced the amount of the penalty from $640,432.16 to $533,065.59 because "Tom's Foods does not have a history of peanut violations." It is noted that the USDA did not enter its final decision in the matter until 295 days after the hearing, which seems to the Court to have been an unconscionable delay in resolving this matter because it adds a substantial amount of interest to any penalty if the Defendants' actions are ultimately upheld by the courts. This would be true because interest accrues at a rate of 6.125% per annum on the penalty from September 29, 1986, which was the date of the letter which assessed the penalty. In any event, this concluded Tom's administrative appeal rights and Tom's then filed this suit on April 15, 1988.

### The Scope of Review

The Court has the power to review agency determinations under the Administrative Procedure Act ("APA") which provides that a reviewing court shall hold unlawful and set aside agency actions found to be contrary to law, arbitrary, capricious, or an abuse of discretion, or unsupported by substantial evidence, and judicial review is normally confined to the full administrative record before the agency at the time the agency made the decision. Tom's presented evidence to the USDA and the administrative record is complete and ripe for review.

### The Charges and the Facts

██ The CCC assessed a penalty against Tom's for "failure to grade out of commingled warehouse storage under supervision" farmers stock runner peanuts as required by 7 C.F.R. § 1446.57-.58 and for violation of 7 C.F.R. § 1446.57(d) which requires that "[c]ontract additional peanuts must be inspected on a farmers stock basis and

accounted for on a dollar-value basis less a one time adjustment for shrinkage." The record shows that there is no dispute that federal-state personnel inspected "additional" peanuts originally held by Tom's as farmers stock and accounted for these peanuts on a dollar-value basis less a one time adjustment for shrinkage. Indeed, if this activity had not occurred the CCC would not have had the data it used to calculate the penalty amount. There is likewise no dispute that the GFA inspected Columbian peanuts on a farmers stock basis. In fact, these prior inspections of the subject peanuts of both parties is what facilitated the exchange of obligations because the peanuts were of the same grade.

Defendants charged that Tom's violated the provision of 7 C.F.R. § 1446.58 which requires that the appropriate volume of farmers stock "additional" peanuts be "graded out" under supervision. The subject peanuts were "graded out" under supervision in this case.

The regulations do not require that the "grading out" be done by the "handler." The regulations merely require that the handler "arrange for" on-site supervision. Moreover, § 1446.58(b) provides that "notification of processing to the Association [the GFA] by the handler (*or cleaner, sheller, or processor under contract with the handler*) shall be sufficient." 7 C.F.R. § 1446.58(b) (emphasis added).

When Tom's contracted with Columbian for the exchange of obligations, Columbian agreed to accept the regulatory obligation for the "additional" peanuts transferred to Columbian, including "grading out" of those peanuts. The contract provided specifically that: "Tom's will transfer such peanuts to Columbian by ASCS–1006, with Columbian accepting the export obligation upon approval by the GFA of the ASCS–1006." Columbian, a handler under contract with Tom's, notified the GFA that supervision was required for the "grading out" of these peanuts, and the GFA supervised the grading out. Thus, it is undisputed that Tom's complied with the requirements of § 1446.58 which require that

Tom's "arrange for" supervision and grading out of "additional" peanuts.

After receiving the GFA's approval of the contract 1006 and completing the exchange with Columbian, Tom's possessed only "quota" peanuts. These peanuts are not subject to the outside supervision requirement of § 1446.58, which only applies to "additional" peanuts. Therefore, Tom's failure to arrange for supervision of its "quota" peanuts does not violate § 1446.58.

The Defendants charged that Tom's violated 7 C.F.R. § 1446.57(e)(1), which states:

Handlers shall dispose of all contract additional peanuts, either by exportation, crushing, or substitution, in accordance with the requirements and procedures of § 1446.58.

Section 1446.58(f) provides for the domestic sale or transfer of "additional" peanuts, and states:

The handler must submit contracts (CCC–1006) covering any domestic sale, transfer, or other disposition of farmers stock contract additional peanuts to the association [the GFA] for written approval. Such approval must be obtained prior to any physical movement of the peanuts by the handler from the buying point. Approval of any domestic sale, transfer, or other disposition may be made only if the person to whom the peanuts are sold, transferred, or disposed of agrees in writing to handle and crush ... or export the contract additional peanuts as raw peanuts or peanut products in accordance with the terms and conditions of this subpart. Approval of such contracts may be made before or after delivery of the peanuts to the handler by the producer.

It is the Court's view that Tom's disposed of its "additional" peanuts in accordance with §§ 1446.57 and 1446.58. Tom's submitted its contract 1006 to the GFA and the GFA expressly approved the exchange. Once the GFA approved the contract 1006 for the transfer of "additional" peanuts and Tom's and Columbian consummated the exchange, Columbian held the regulatory obligations for these "additional" peanuts. The transaction between Tom's and Columbian constitutes a "sale, transfer, or other disposition of farmers stock contract additional peanuts" as referenced in § 1446.58(f). The GFA approved the transfer of the peanuts, which § 1446.58(f) requires. In further accordance with § 1446.58(f), Columbian accepted in writing the export obligation for the "additional" peanuts. As required by § 1446.57(e), Tom's disposed of its "additional" peanuts "in accordance with the requirements and procedures of § 1446.58."

Furthermore, *on its face* § 1446.58(f), which is referenced in § 1446.57(e), does not require or mandate physical movement, or prohibit it. The regulation only provides that, where there is any physical movement, the handler must have prior approval from the GFA. More significantly, the sentences containing the terms "physical movement" and "delivery" refer solely to transfers between *producers* (farmers) and handlers, not between *handlers* and handlers. Thus, the provision on physical movement, on its face, is inapplicable to the transaction between Tom's and Columbian at issue in the case.

It is also undisputed that Columbian disposed of the "additional" peanuts by export prior to the deadline mandated by § 1446.57(e)(2). As a result, Columbian exported the correct quantity and grade of peanuts and met the regulatory obligations of § 1446.57 for the disposition of "additional" peanuts.

It is important to note that no statute or regulation requires the transfer of peanuts by physical delivery only or prohibits the exchange of obligations that occurred between Tom's and Columbian in this case. Absent such an express prohibition, the penalty assessed against Tom's is unauthorized and, therefore, unenforceable.

Although an agency's interpretation of its own regulations is entitled to deference, the interpretation must comply with the regulations promulgated by the agency. *Charter Peachford Hospital v. Bowen*, 803 F.2d 1541, 1546–47 (11th Cir.1986). The plain reading of § 1446.54(d) reveals no requirement that contract additional peanuts be physically transferred. In fact,

this regulation does not mention physical transfer at all. Thus, the CCC's reliance on § 1446.54(d) as a basis for requiring physical transfer of peanuts is erroneous. The Defendants cannot construe the regulations to require the physical exchange of peanuts when the regulations do not expressly set forth any such requirement. In *Diamond Roofing Company v. Occupational Safety & Health Review Commission,* 528 F.2d 645 (5th Cir.1976), the Court stated:

> If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express.

The Court of Appeals for the Eleventh Circuit has consistently followed the rule of strict construction of penal statutes. *See, Gold Kist, Inc. v. U.S. Department of Agriculture,* 741 F.2d 344 (11th Cir.1984).

Even assuming, for the sake of argument, that the regulations require Tom's to transfer the peanuts by physical delivery, Tom's should not be assessed a penalty because it reasonably interpreted the regulations to permit the transfer of obligations without the physical exchange of peanuts. The CCC should not be allowed to penalize Tom's for such an interpretation because Tom's did not have fair warning from the regulations that the CCC intended to prohibit such transactions.

### The Substantial Evidence Question

■ The Court further determines that the record in this case demonstrates that substantial evidence does not exist which would justify the imposition of the penalty against Tom's, and as we have already noted, the APA directs that agency action be overturned if it is unsupported by substantial evidence in the record.

The CCC, in its letter affirming the assessment of the penalty, stated that the GFA believed that Tom's and Columbian were going to physically exchange the peanuts. The CCC, therefore, rejected Tom's equitable estoppel argument on the basis that the GFA misunderstood Tom's intention and believed that they were going to

physically exchange peanuts rather than exchange just the regulatory obligations applicable to the peanuts. The record establishes that the GFA, in fact, knew that Tom's and Columbian were not going to physically exchange peanuts.

James Godwin of the GFA admitted in his May 15, 1987, letter to the CCC:

> Prior to the 1985 crop peanut harvest, either Alvin Meyer or Webster Hix of Tom's Foods, Columbus, Georgia called the GFA office about the sale and transfer of contract additional peanuts to Columbian Peanut Company. They wanted to avoid physical movement of approximately 1,000 tons of additional farmers stock from Tom's Columbus to Columbian, McRae while Columbian would have to move 1000 tons of quota farmers stock from McRae to Tom's at Columbus.

Godwin stated in his second letter to the CCC that "I do not now nor have I ever denied being aware of the *intent* of Tom's and Columbian regarding 1985 crop peanuts." (emphasis in original). Later in the letter Godwin states that "[f]rom the outset I knew what Tom's and Columbian wanted to do. I knew their *intent* and advised them as the year progressed as to alternatives that would accomplish this intent." (emphasis in original).

Patricia Huey of the GFA also was well aware that Tom's and Columbian did not intend to physically exchange the peanuts. On or about February 18, 1986, Tom's submitted its contract 1006 to the GFA for its approval of the transfer of contract additional peanuts from Tom's to Columbian. Shortly after Tom's submitted its contract 1006, but prior to its approval, Webster Hix and Alvin Meyer of Tom's both explained to Huey of the GFA that Tom's and Columbian would not physically exchange the subject peanuts. Huey stated that she would talk with Godwin about the proposed transaction and get back to Tom's if there were any problems with the transaction. The GFA later approved the transaction. Tom's relied upon this approval because the GFA never subsequently contacted Tom's, and Tom's had no reason to believe there was any problem with the exchange

because Tom's had thoroughly explained the transaction to the GFA.

The record establishes that the GFA approved the contract 1006 permitting the exchange of the obligation with full understanding that Tom's and Columbian would not physically exchange the peanuts. The record lacks any relevant evidence sufficient to conclude reasonably that the GFA did not know that Tom's and Columbian would not physically exchange the peanuts. Therefore, the assessment of the penalty against Tom's on the basis that the GFA misunderstood Tom's intentions is not supported by substantial evidence.

### Equitable Estoppel

■ The facts of this case clearly lead to the conclusion that the Court should equitably estop the Defendants from assessing a penalty against Tom's.

In recent years the doctrine of equitable estoppel has been applied with increasing frequency against the government. The Supreme Court has recognized the need to apply this equitable doctrine against the government because of the overriding "interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Community Health Services,* 467 U.S. 51, 61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). And the Court of Appeals for the Eleventh Circuit has invoked the equitable estoppel doctrine against the government. *FDIC v. Harrison,* 735 F.2d 408 (11th Cir.1984).

In order for estoppel to apply against the government in the Eleventh Circuit, the following requirements must be met: (1) the traditional private law elements of estoppel must have been present; (2) the government must have been acting in its private or proprietary capacity as opposed to its public or sovereign capacity; and (3) the government's agent must have been acting within the scope of its authority. *Harrison,* 735 F.2d at 410–11. Each of these requirements has been met in this case.

The traditional elements of estoppel are: (1) words, acts, conduct or acquiescence

causing another to believe in the existence of a certain state of things; (2) willfulness or negligence with regard to the acts, conduct or acquiescence, and; (3) detrimental reliance by the other party upon the state of things so indicated. *In re Garfinkle,* 672 F.2d 1340, 1347 (11th Cir.1982).

The facts satisfy these elements in this case. The GFA's conduct, through its express approval of the exchange between Tom's and Columbian, caused Tom's to believe that the transaction complied with the regulations. Tom's made full disclosure of the facts surrounding the transaction to the GFA, and the GFA understood that Tom's and Columbian were merely exchanging regulatory obligations without the physical exchange of peanuts. Tom's, therefore, reasonably relied on the GFA's approval of the transaction.

In assessing this penalty against Tom's the CCC was acting primarily for the benefit of the government or an individual agency and it was, therefore, acting in a proprietary capacity and subject to estoppel. *See, Harrison, supra,* at 411–12. The activity of the CCC in this case is precisely like the activity of the FDIC in *Harrison.* The CCC intended the penalty assessed against Tom's to deprive Tom's of some alleged economic gain. In its letter affirming the assessment of the penalty the CCC noted that the penalty assessed against Tom's:

> is intended to reflect the minimum cost that could have been paid by Tom's Foods to obtain peanuts for food use and to assure Tom's Foods does not profit as a result of disposing of contract additional peanuts in the domestic market.

Thus, the CCC had a proprietary purpose in assessing the penalty against Tom's—namely to deprive Tom's of the profits it allegedly obtained in violation of the Price Support Program. Because the CCC, like the FDIC in *Harrison,* is a corporation acting in an essentially proprietary role, its actions are subject to estoppel.

### The Scope of GFA's Authority

The provisions of the Agricultural Adjustment Act and the CCC's own regula-

tions establish that the GFA is a representative of the CCC and acted within the scope of its authority in approving the arrangement between Tom's and Columbian and as a matter of law the CCC, as an agent of the United States, is bound by the acts of its agent, the GFA.

The GFA knew that Tom's and Columbian would not physically move the peanuts involved in the transaction. The GFA fully understood the terms of the transaction and with this knowledge approved the contract 1006 submitted by Tom's which permitted the transfer. The GFA's approval of the transfer was within the scope of its authority as an agent of the CCC. Tom's reasonably relied, to its detriment, upon the GFA's approval of its exchange. The USDA is bound by the GFA's approval of the exchange and, therefore, we are led to the conclusion that the Court should estop the USDA from assessing the penalty against Tom's.

### ORDER

Consistent with the foregoing, IT IS ORDERED that the Defendants' motion for summary judgment be and is hereby denied and that the Plaintiff's motion for summary judgment be and is hereby sustained, the Court having concluded that:

(1) Tom's complied with the applicable governmental regulations and therefore the penalty imposed on Tom's is void and unenforceable;

(2) the Defendants' actions were unsupported by substantial evidence and therefore the penalty is void and unenforceable; and

(3) the Defendants are equitably estopped from assessing a penalty against Tom's.[1]

An appropriate judgment will be entered.

---

1. Having determined that the penalty is unenforceable, the Court pretermits discussion of the Plaintiff's alternative request that the penalty be reduced to zero.