**In the Matter of TURTLE CREEK, LTD., et al., Debtors.**

**CONDOR ONE, INC., Plaintiff,**

v.

**TURTLE CREEK, LTD., et al., Defendants.**

**Bankruptcy Nos. 92–82216 to 92–82227. Adv. Nos. 95–80151 to 95–80162.**

United States Bankruptcy Court, N.D. Alabama, Northern Division.

April 3, 1996.

Sherrie Tucker Freeman, Birmingham, AL, John Whittington, Birmingham, AL, for plaintiff.

Chuck Gibbs, Dallas, Texas, Michael Held, Dallas, Texas, Kyle Weems, Chattanooga, TN, for defendants/debtors.

## MEMORANDUM OPINION

JACK CADDELL, Bankruptcy Judge.

On consideration before the Court is a complaint filed by Condor One, Inc. (hereinafter "Condor"), to determine the extent and priority of Condor's lien against certain accrued rents, and to require turnover or, alternatively, to enjoin the use of said funds. On July, 17, 1995, Condor filed the above-styled adversary proceeding. On the same day, Debtors filed their Complaint to Determine Validity and Extent of Liens with respect to the accrued rents. By certain procedural order dated July 28, 1995, the Court determined that the relief requested in Condor's complaint subsumed the relief requested in Debtors' complaint. Accordingly, the Court consolidated the adversary proceedings with Condor treated as the plaintiff, and Debtors as the defendants herein.

The trial in this matter was held on January 25 and 26, and February 7, 1996. Appearing were Douglas Goldrick, a representative of Condor, counsel for Condor, Sherrie Freeman and John Whittington, Bryan Doran, a representative of debtors/defendants, and counsel for the debtors/defendants, Chuck Gibbs, Michael Held, and Kyle Weems. The Court has considered the pleadings, the documents submitted in support thereof, and the arguments of counsel, and finds and concludes as follows.[1]

## I. STATEMENT OF FACTS

1. The debtors are twelve limited partnerships: Turtle Creek, Ltd., The Northwood Company, Northwood II, Ltd., Skyline South, Ltd., Sundown, Ltd., Creekside, Ltd., Four Seasons, Ltd., Knollwood II, Ltd., Knollwood, Ltd., Lost Tree, Ltd., Hunter's

---

1. The following Memorandum Opinion constitutes Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

Pointe, Ltd., and McRae, Ltd. (hereinafter the "Debtors"), with two general partners, Das A. Borden ("Borden"), and Das A. Borden & Company ("DAB"). Each Debtor owns a single multi-family apartment project located in Alabama. The Debtors have no source of income other than from the rental income generated by the operation of the multi-family projects.

2. Each Debtor mortgaged its project by executing and delivering a mortgage agreement[2] and note to its mortgagee. The mortgages and notes were duly recorded in the appropriate county Probate Court. The loans are nonrecourse such that the lender is not entitled to receive more than the value of the collateral upon foreclosure, absent certain exceptions.

3. The United States Department of Housing and Urban Development ("HUD") guaranteed each loan by providing federal mortgage insurance to the issuer of each loan pursuant to Section 221(d)(4) of the National Housing Act, 12 U.S.C. § 1701, *et seq.* The mortgage insurance provides protection to mortgagees by allowing a mortgagee to assign the loan to HUD upon default.[3] Before HUD will provide mortgage insurance to a mortgagee, HUD requires all mortgagors to execute certain Regulatory Agreements[4] pursuant to Section 221(d)(4) of the National Housing Act, 12 U.S.C. § 17151(d)(4). The Regulatory Agreements govern the rights and responsibilities of the mortgagor to HUD and of HUD to the mortgagor. The Regulatory Agreements remain in effect "so long as the contract of mortgage insurance continues in effect and during such further time as the Secretary shall be the owner, holder or reinsurer of the mortgage or obligated to reinsure the mortgage."

4. Pursuant to the Regulatory Agreements, Debtors were required to seek HUD approval before a transfer of the real estate properties could be effectuated. In 1987, Borden and DAB transferred 51% of their general partnership interests to the Hall Financial Group ("Hall"), but failed to receive HUD approval of the transfer. Upon discovery of the transfer, HUD initiated an investigation of the circumstances surrounding said transfer by the Office of the Inspector General. Based upon the findings embodied in a report prepared by the Inspector General, HUD required the sale to Hall to be set aside. *See* Condor Exhibit 40.

5. On April 18, 1988, an involuntary bankruptcy proceeding was filed against Borden. Borden consented to the bankruptcy, and converted the case to a case under Chapter 11, with DAB also filing a voluntary petition for relief under Chapter 11.

6. By March of 1991, each of the Debtors had defaulted on its loan thereby precipitating the assignment of the loans to HUD, whereby HUD became the owner of the Mortgages and Mortgage Notes rather than merely insuring the same. As the record owner of the loans HUD, by and through a HUD official located in the Birmingham of-

2. Paragraph four (4) of each mortgage contains the following assignment of rent clause:

That all rents, profits and income from the property covered by this Mortgage are hereby assigned to the Mortgage for the purpose of discharging the debt hereby secured. Permission is hereby given to Mortgagor, so long as no default exists hereunder, to collect such rents, profits and income.

3. Paragraph five (5) of each mortgage provides:

That upon default hereunder Mortgagee shall be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the property described herein and operate same and collect the rents, profits and income therefrom;

4. Each of the Regulatory Agreements contains the following assignment of rent provision:

As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Security because of his liability under the endorsement of the note for insurance, and as a security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgage property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereunder.

fice, Robert Moore, filed a motion to lift stay in the Borden proceedings on September 12, 1991, in which HUD sought permission to proceed against Debtors' properties.

7. HUD obtained appraisals on each of the twelve properties in connection with the motion to lift to demonstrate that Debtors lacked equity in the properties.

8. On January 21, 1992, the primary secured creditor of Borden and DAB, E.L. McMillian, filed a Second Amended Chapter 11 Plan of Reorganization ("Plan") on behalf of Borden and DAB. The Plan proposed to restructure the debts owed by Debtors to HUD in the context of bankruptcy proceedings of the Debtors' general partners, Borden and DAB. Specifically, the debts were to be restructured by reducing the amounts due thereon to the appraised value of each property, plus an additional $150,000.00 over said amount in the event the property was sold for a profit. The Plan further proposed to re-amortize the debts over a term of thirty (30) years.

9. The motion to lift the stay and confirmation hearing were held on February 19, 1992. At the hearing, HUD, through Richard O'Neal, an Assistant U.S. Attorney, vigorously objected to the proposed modification of the debts owed to HUD. Nevertheless, Judge Breland instructed counsel for E.L. McMillian (the primary secured creditor of Borden and DAB), David Anderson, to propose an order confirming the plans for Borden and DAB. Moore testified that it was his belief that Judge Breland intended to approve the Second Amended Plan of Reorganization, thereby restructuring Debtors' debts in a bankruptcy proceeding in which HUD was not a creditor.

10. At the conclusion of the hearing, Moore informed Anderson that HUD would appeal any decision in which the debts were non-consensually restructured where HUD was not a creditor in the bankruptcy proceeding. Faced with an imminent appeal, Anderson suggested that such protracted litigation could possibly be avoided by reaching an agreement outside of the Borden bankruptcy whereby the debts would be consensually modified with the Debtors' agreement to file individual Chapter 11 petitions.

11. Accordingly, the proposed order was never presented to Judge Breland because Borden agreed to remove the Debtors from the Plan upon the execution of certain Modification Agreements in which the debts owed to HUD were to be consensually modified upon the filing of twelve individual bankruptcy petitions for each of the Debtors.

12. In response to Anderson's suggestion, Moore contacted Regional Counsel, Ray Buday to arrange a conference call with the appropriate HUD officials to discuss possible remedies that could bring about the conclusion of the Borden litigation. The conference call was held on February 24, 1992. Included in the conference call were Robert Moore, Ray Harris, Regional Administrator for the Atlanta region, Richard Compton, Deputy Regional Administrator, Ray Buday, Regional Counsel, Bill Miller, Acting Regional Director for Housing, Ralph Ruggs, Director of Management in Birmingham, and Richard O'Neal, Assistant U.S. Attorney.

13. After the conference call, Moore continued to negotiate a conclusion to the Borden litigation with Anderson. Pursuant to these negotiations, Moore supervised the drafting of certain Modification Agreements that are the subject of this adversary proceeding. The Modification Agreements included the following provisions:

(a) Waiver of all prior defaults under the original terms of the mortgage;

(b) Equity participation out of net sales proceeds or an equity kicker;

(c) Modified payment provisions under which HUD agreed to forgive 10,000,-000.00 in debt, including past due principal, accrued interest, delinquent charges; and

(d) Payment of sanctions issued by HUD regarding the Hall transfer.

14. On April 30, 1992, Moore forwarded the Modification Agreements to Anderson for execution. Jane Springer, an employee of Borden, executed each of the documents on behalf of Debtors. Thereafter, Anderson returned the documents to HUD where Robert Lunsford, the Area Manager of the local HUD office located in Birmingham, Alabama,

executed the same on behalf of HUD. After the documents were fully executed, Moore communicated the fact to Anderson in a letter dated June 8, 1992. On that same day, Moore was advised that there were problems with the execution of the Modification Agreements, and that no further action was to be taken at that time regarding said agreements.

15. On June 15, 1992, Moore advised Anderson that a question regarding the execution of the agreements had arisen. Thereafter, in a letter dated June 18, 1992, Moore advised Anderson that he had "been instructed to rescind/retract" the Modification Agreements in that no official located in either the Birmingham Field Office or the Atlanta Regional Office was authorized to enter an agreement that undertook to compromise debt owing to HUD. *See* Condor Exhibit 37.

16. HUD never transmitted a copy of the fully executed Modification Agreements to Debtors. Nevertheless, Debtors began to make payments in accordance with the provisions of the modified mortgage terms, and each filed with this Court a voluntary petition under Chapter 11 of Title 11, of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, on October 5, 1992. Pursuant to §§ 1107 and 1108 of the Code, the Debtors remained in possession of their property and managed their affairs as debtors-in-possession. No Trustee or committee of creditors has heretofore been appointed in this case. For approximately one year after the execution of the Modification Agreements Debtors made payments thereunder to HUD totalling $1,941,495.64. Debtors also paid the aforementioned sanctions in full, totalling $375,698.94, into a Modification Agreement Reserve Account.

17. On March 6, 1995, Debtors filed a Motion for Use of Cash Collateral, specifically accrued post-petition rents, pursuant to 11 U.S.C. § 363(c)(2), and a motion for valuation of HUD's interest in Debtors' property pursuant to 11 U.S.C. § 506. HUD filed an objection to Debtors use of the accrued rents on March 10, 1995. However, prior to the filing date of Debtors' petitions, HUD did not take any action to have a receiver appointed nor to sequester the rents.

18. On May 8, 1995, HUD assigned its interest in the Mortgage and Mortgage Notes to Condor. The Loan Sales Agreement between HUD and Condor provided that "[f]rom and after the Closing Date, the Regulatory Agreement relating to each Mortgage Loan shall be released and terminated as provided in the Release of Regulatory Agreement."

19. HUD effectuated the release of each of the Regulatory Agreements between May 8, 1995 and July 31, 1995. However, on August 25, 1995, HUD executed a Supplement Assignment in favor of Condor that attempted to clarify the interest transferred to Condor on May 8, 1995.

20. On May 26, 1995, Condor filed a Notice of Transfer of Claims from HUD to Condor, and a motion seeking the turnover of all accrued rents held by Debtors in escrow, prohibiting Debtors' use of said accrued rents, and requesting relief from the automatic stay. During the hearing on the motion, the Court determined that certain issues before the Court required the filing of an adversary proceeding. The Court entered an order dated August 21, 1995, reserving ruling on the motion pending the outcome of the consolidated adversary proceeding.

## II. CONCLUSIONS OF LAW

The central issues presented by this case are: (1) Whether the alleged Modification Agreements are enforceable where Condor contends that the official who executed said agreements lacked authority to bind HUD and Condor as HUD's assignee; and (2) Whether Debtors are entitled to the use of certain accrued, post-petition rents generated by the Debtors' properties from the filing date, October 5, 1992, until May 26, 1995?

### A. MODIFICATION AGREEMENTS

Debtors contend that the Modification Agreements govern the indebtedness owed by Debtors to HUD and Condor as HUD's assignee, while Condor counters that the original Mortgage Notes govern said indebt-

edness. In support of their position, Debtors argue that Condor is estopped from asserting that the Modification Agreements are unenforceable because the execution of said agreements did not contravene enumerated regulation or statute.[5] Alternatively, Debtors argue that the Modification Agreements are enforceable because they were executed in settlement of litigation. After careful consideration, the Court concludes that the only argument which presents a valid and substantial question is the argument that Condor is estopped from denying the enforceability of the Modification Agreements.

■ The doctrine of equitable estoppel precludes a litigant from asserting a claim or defense that might otherwise be available to it against another party that has detrimentally altered its position in reliance on the former's misrepresentation. *Federal Deposit Ins. Corp. v. Harrison*, 735 F.2d 408, 410 (11th Cir.1984). The traditional elements of equitable estoppel are: (1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (2) willfulness or negligence with regard to the acts, conduct or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated. *Romagnolo v. United States (In re Romagnolo)*, 190 B.R. 946 (Bankr.M.D.Fla.1995); *Harrison*, 735 F.2d at 411. In the Eleventh Circuit, the affirmative defense of equitable estoppel is only available against the government where the litigant proves (1) the traditional elements of equitable estoppel; (2) that the government acted in a proprietary capacity; and (3) that the agent purporting to bind the government, acted within the scope of his or her actual authority. *United*

*States Vonderau (In re Vonderau)*, 837 F.2d 1540 (11th Cir.1988); *In re Romagnolo*, 190 B.R. at 946; *In re Harrison*, 735 F.2d at 410.

■ Although certain courts have applied the doctrine of equitable estoppel to prevent the government from asserting a claim or defense to which the government would otherwise be entitled, the Supreme Court has "reversed every finding of estoppel" against the government that it has reviewed. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 422, 110 S.Ct. 2465, 2470, 110 L.Ed.2d 387 (1990). In the case of *Romagnolo v. United States (In re Romagnolo)*, 190 B.R. 946 (Bankr.M.D.Fla.1995), Judge Paskay questioned whether equitable estoppel is ever available against the government. In the Eleventh Circuit case of *Bokum v. Comm'r of Internal Revenue*, 992 F.2d 1136 (11th Cir.1993), Chief Judge Tjoflat recognized that the Supreme Court has made it clear that equitable estoppel will lie against the government only in the rarest circumstance, if ever:

> Equitable estoppel claims lodged against the government are of a different ilk from those asserted against a private party. The Supreme Court has stated that equitable estoppel will not lie against the government as against private litigants. *Heckler v. Community Health Serv.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). The Court emphasized that it has, however, refused to adopt a "flat rule" prohibiting estoppel claims against the government, leaving open the question of whether such a claim is ever available. *Id.* at 420, 110 S.Ct. at 2470–71; *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224.

---

5. Albert Sullivan, Director of the Office of Multi-Family Asset Management and Disposition, testified that to his knowledge no provision exists which expressly prohibits local HUD officials from authorizing the forgiveness of debt owed to HUD. Sullivan further testified that the following provision is the only statute, regulation or other authority that could conceivably be interpreted to prohibit the forgiveness of debt by local HUD officials:

*Cash Final Settlements:*

\* \* \* \* \* \*

If the mortgagor wants to pay off a delinquent mortgage for less than the debt, the only proce-

dure for this is for the mortgagor to bring the loan current and bid on it in a scheduled HUD mortgage auction.

Handbook No. 4350.1 CHG–54 ¶ 3.9.

However, Sullivan admitted that this paragraph merely applies where a mortgagor wishes to pay off its mortgage early for less than the full value of the mortgage.

Recently, the Eleventh Circuit acknowledged that the "defense of equitable estoppel to a federal cause of action will lie against the government only in the most extreme circumstances." *Gibson v. Resolution Trust Corp.*, 51 F.3d 1016, 1025 (11th Cir.1995).

In the instant case, the principal contested issue is whether or not Lunsford, the HUD official who executed the Modification Agreements, had actual authority to execute said agreements thereby binding HUD and Condor as HUD's assignee to the terms of the agreements. As the party alleging the validity of the Modification Agreements, Debtors have the burden of proving each element. *See Hall v. United States*, 19 Cl.Ct. 558, 559–60 (1990).

To sustain this burden of proof with regard to the element of actual authority, Condor contends that Debtors are required to cite a statute or regulation that authorized Lunsford to execute an agreement purporting to forgive debt on behalf of HUD. *See Empire–Detroit Steel v. Occupational Safety and Health Review Commission*, 579 F.2d 378, 383 (6th Cir.1978) (noting that "no statute, regulation or other authority" was cited authorizing the government agent to enter into a binding contract during a telephone conversation without memorializing the same). In contrast, Debtors insist that the doctrine of equitable estoppel can be used to prevent the federal government from denying the enforceability of an agreement entered into by a federal agent where no enumerated policy specifically prohibits the agents actions. *See Molton, Allen & Williams, Inc. v. Harris*, 613 F.2d 1176 (D.C.Cir.1980); *Tom's Foods, Inc. v. Lyng*, 703 F.Supp. 1562 (M.D.Ga.1989); *Federal Deposit Ins. Corp. v. Harrison*, 735 F.2d 408 (11th Cir.1984).

The Court finds Debtors' argument that the government is estopped from asserting its claim or defense where no statute or other authority exists prohibiting the conduct of the federal agent unpersuasive. However, the Court does not believe that Debtors' inability to cite a statute, regulation or other authority expressly providing Lunsford with actual authority to execute the Modification Agreements is dispositive. Instead, Debtors' inability to cite such statute is merely one factor which must be considered when deter-mining whether Lunsford had actual authority to bind the government. Nevertheless, the Court finds that Debtors have not satisfied their burden of proof with regard to the element of actual authority.

The cases cited by Debtors in support of their position can be distinguished from the instant case. In the case of *Federal Deposit Ins. Corp. v. Harrison*, 735 F.2d 408 (11th Cir.1984), the FDIC was equitably estopped from asserting its claim against two defendant guarantors when their former business associate defaulted on a loan guaranteed by defendants. After the guarantors signed the original guaranty contract, they divided the note into three equal shares with each party becoming primarily liable for one of the notes. After being appointed as the receiver of the insolvent issuing bank, the FDIC made a demand for the three notes. Each of the defendants' contacted the FDIC separately to determine the extent of his liability. The defendants were each assured by FDIC agents that the FDIC would not enforce the guaranty contracts. The Eleventh Circuit distinguished cases involving actions taken by government agents that were beyond the scope of the agents authority because the FDIC did not contend that its agents lacked the authority to waive the FDIC's rights under the guaranty contracts.

This case cannot stand for the proposition that where no statute specifically prohibits the actions taken by a federal agent, the government is estopped from denying the enforceability of the agents actions. The authority of the FDIC agent was simply not at issue in *Harrison*. The instant case is exactly in opposite in that Condor adamantly maintains that Lunsford did not have the authority to bind HUD.

Another case which Debtors cite in support of their position is *Tom's Foods, Inc. v. Lyng*, 703 F.Supp. 1562 (M.D.Ga.1989). In that case, the plaintiff filed a complaint against the USDA after being assessed penalties for the violation of certain peanut support regulations. Plaintiff notified an officer of the Georgia–Florida–Alabama Peanut Association ("GFA") that it had entered an agreement with another peanut handler under which the parties agreed to exchange

certain support obligations, but only on paper. The GFA represents the Commodity Credit Corporation ("CCC"), an agency of the United States Department of Agriculture. Although the GFA had a long-standing history of advising peanut handlers regarding compliance procedures, the officer never informed plaintiff that the intended transaction would violate CCC procedure. *Id.* at 1565. The court determined that the actions of the GFA officer were within the scope of his authority. The court explained as follows:

> The provisions of the Agricultural Adjustment Act and the CCC's own regulations establish that the GFA is a representative of the CCC and acted within the scope of his authority in approving the arrangement between Tom's and Columbian and as a matter of law the CCC, as an agent of the United States, is bound by the acts of its agent, the GFA.

*Id.* at 1570.

From this, Debtors ask this Court to hold that the actions of Lunsford, a representative of HUD, were within the scope of his authority because no statute expressly prohibits a local HUD official from authorizing the forgiveness of $10,000,000.00 in debt owed to HUD. However, the court in *Lyng* based its decision upon the finding that the CCC's own regulations established that the agent acted within his authority. This case clearly cannot support Debtors' argument.

Debtors' further contend that the case of *Molton, Allen & Williams, Inc. v. Harris,* 613 F.2d 1176 (D.C.Cir.1980), supports their position that the government is estopped from asserting the validity of a contract entered into by a federal agent where no specific statute contradicts the actions taken by the federal agent. However, the court in *Harris* specifically found that the governing provisions of GNMA, memorialized in the GNMA Seller's Guide, reserved unto GNMA the right to alter or waive any condition precedent, consistent with law, to contract formation. Accordingly, GNMA had actual authority to waive the condition precedent of delivery to enter into a binding contract. The court further found that GNMA had delegated this authority to the FNMA agent who acted as GNMA's attorney in fact by regulation whereby such agents were granted "the full authority to do all things necessary and proper to their duties, 'to all intents and purposes, as the Association might or could do.'" *Id.* at 1178. Although it is true that no statute specifically authorized the actions of the federal agent, the court nevertheless found that actual authority existed because general authority to modify the contract requirements existed. Debtors have not demonstrated to this Court that any such general authority exists for a local HUD official to forgive debt owed to HUD. Without more, this Court will not infer that Lunsford had the authority to forgive approximately $10,000,000.00 in debt due to HUD simply because no statute specifically contradicts such actions.

Because this Court finds that Debtors failed to prove the third element of equitable estoppel, specifically that the government agent who executed the Modification Agreements on behalf of HUD had the authority to do so, it is unnecessary for the Court to consider the remaining elements. We must, therefore, turn to the original mortgage notes to determine who is entitled to the subject accrued rents.

## B. CASH COLLATERAL: Accrued Post–Petition Rent

Section 363 of the Bankruptcy Code allows a debtor-in-possession, as trustee, to use, sell, or lease certain property of the estate in the ordinary course of the debtor's business. One notable exception to this rule arises where a debtor seeks to use cash or "cash collateral" in which another has a security interest. A debtor cannot use cash collateral unless the secured creditor consents to the use, lease or sale of such funds or the court enters a cash collateral order permitting the use, sale or lease after a hearing is held to determine whether the creditor is adequately protected pursuant to 11 U.S.C. § 363(c). Section 363(a) defines cash collateral to include:

> ... cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity

other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

Section 552(b), as in effect at the time of the filing date of Debtors' petitions, directs us to look to *applicable nonbankruptcy law* to determine whether a creditor has a valid security interest in property of the estate:

[I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by *applicable nonbankruptcy law*, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

Condor asserts that all accrued rents generated by Debtors' properties from the filing date of Debtors' petitions through May 26, 1995 constitute the cash collateral of Condor because the applicable nonbankruptcy law is Alabama case law which provides, according to Condor, that upon default by a mortgagor, the mortgagee immediately becomes entitled to any rents generated by the mortgagor's property until foreclosure occurs where the mortgage contains an assignment of rents clause. Alternatively, Condor alleges that it is entitled to all accrued rents generated by Debtors' properties from the filing date of the petition through May 8, 1995, because

Condor, as the assignee of HUD, has succeeded to all of HUD's rights as a federal lender.

Debtors, meanwhile, assert that state law, i.e. Alabama law, rather than federal common law must be used to determine whether Condor has an enforceable interest in rents collected postpetition because HUD released the Regulatory Agreements before assigning its interest thereunder to Condor. Debtors further argue that Condor has not taken all the necessary actions to enforce its rights to the accrued rents pursuant to applicable case Alabama law.

The Court finds that Condor does not have an enforceable interest in the accrued rents for the following reasons:

(i) The Supplemental Assignments did not convey federal lender status unto Condor, thus Alabama law controls as the applicable nonbankruptcy law referred to in section 552(b) of the Bankruptcy Code; and

(ii) Condor failed to take the necessary actions with regard to the accrued rents as mandated by relevant Alabama case law to perfect/enforce its rights therein.

### (1) FEDERAL LENDER STATUS

 Under section 552 of the Bankruptcy Code, Condor will be deemed to have a security interest in Debtors' postpetition rents only to the extent that its security interest has been perfected under applicable nonbankruptcy law. It is well established that "[u]nless some federal interest requires a different result" state law determines whether a mortgagee has an enforceable interest in postpetition rents. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).[6] However, federal common law governs the manner by which HUD, as a federal lender, "may perfect its interest in rental income." *In re Executive House Assocs.,* 99 B.R. 266, 275 (Bankr.

---

6. The 1994 amendments to the Bankruptcy Code, contained in the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, enacted October 22, 1994, undertook to revise section 552(b) of the Code. The amendments attempted to clarify the treatment of security interests in postpetition rents by dividing section 552(b) into two paragraphs, and deleting the reference to "applicable nonbankruptcy law" in subparagraph (b)(2). Apparently, Congress intended to alleviate the necessity of analyzing state law with respect to the assignment of rents. However, the effect of revised section 552(b) is debatable. Regardless, the amendments do not apply to bankruptcy cases filed before the enactment of the 1994 amendments. *See In re Crossroads Market, Inc.,* 190 B.R. 269, 271 (Bankr.N.D.Miss.1994).

E.D.Pa.1989) (citing *U.S. v. Landmark Park & Assocs.,* 795 F.2d 683, 684 (8th Cir.1986)); *United States v. Borden Fin. Corp. (In re Borden Fin. Corp.),* 164 B.R. 260 (Bankr. E.D.La.1994) (providing that federal law should be applied to determine if HUD perfects its security interest in rent).

Condor, as HUD's assignee, asserts that federal common law also governs the manner by which it was required to enforce its rights to the subject postpetition rents because HUD assigned its rights as a federal lender to Condor under the HUD Regulatory Agreements. The Court is of the opinion that Condor is not entitled to step into the shoes of HUD as a federal lender. HUD failed to assign its rights under the Regulatory Agreements to Condor, the only contract between HUD and Debtors, because HUD executed certain Release of Regulatory Agreements, thereby terminating HUD's rights under the Regulatory Agreements. Thereafter, HUD executed certain Supplement Assignments wherein HUD purported to assign its interest under the Regulatory Agreements to Condor. The Supplemental Assignments, however, did not effectuate the assignment of HUD's rights under the Regulatory Agreements to Condor because HUD executed the Supplemental Assignments over one month after it executed the last Release of Regulatory Agreement.

According to Condor, HUD released its future rights under the Regulatory Agreements, but retained all rights to which HUD was entitled prior to the execution of the Releases. In support of its position Condor cites the following language in the Release of Regulatory Agreement:

> ... HUD does hereby release and terminate *prospectively* the Regulatory in effect with respect to the Project and does hereby agree that the Mortgagor, its successors and assigns are released *prospectively* from all obligations set forth in the Regulatory Agreement ...

The Court does not agree with Condor's interpretation of the Releases. The Regulatory Agreements, by their own terms, terminated upon the sale of the mortgage notes to Condor. The Regulatory Agreements were to remain in effect only "so long as the contract of mortgage insurance continue[d] in effect and during such further time as the Secretary [was] the owner, holder or reinsurer of the mortgage or obligated to reinsure the mortgage." Moreover, the sales agreement between HUD and Condor reiterated the fact that the Regulatory Agreements were to terminate upon the sale of the subject projects wherein the Loan Sales Agreement provided that "[f]rom and after the Closing Date, the Regulatory Agreement relating to each Mortgage Loan shall be released and terminated as provided in the Release of Regulatory Agreement."

Debtors insist that the language relied upon by Condor merely means that HUD agreed to release the Regulatory Agreements from the date of execution and forward. The Court agrees with Debtors interpretation, and finds that the language relied upon by Condor to reserve its rights as HUD's assignee under the Regulatory Agreements was ineffective to accomplish Condor's desired result. The Court further believes that Condor, aware of the legal defect in the Loan Sale Agreement, attempted to cure the deficiency by inducing HUD to execute the Supplemental Assignments. However, the Supplemental Assignments were likewise ineffective to assign HUD's rights under the Regulatory Agreements to Condor in that HUD no longer had any rights thereunder when the Supplemental Assignments were executed. Accordingly, we must look to Alabama law to determine whether Condor has enforced its rights to the accrued rents.

## (2) ENFORCEMENT OF RIGHT TO RENTS

■ Under section 552(b) of the Bankruptcy Code, as in effect at the time of the filing date of Debtors' petitions,[7] Condor must satisfy the following requirements before it will have an enforceable interest in the postpetition rents generated by Debtors' properties:

7. *See supra* note 6.

(a) The debtor and creditor have entered into a security agreement prior to the commencement of the bankruptcy;

(b) The security interest created under the agreement extends to property acquired by the debtor prior to the commencement of the bankruptcy case and to the rents derived from such property; and

(c) If these two conditions are present, then the security interest extends to postpetition rents derived from the property to the extent that such an interest is contemplated by the relevant security agreement and to the extent permitted under applicable nonbankruptcy law.

*Matter of May,* 169 B.R. 462, 465 (Bankr. S.D.Ga.1994) (citing *In re Vienna Park Properties,* 976 F.2d 106, 111–12 (2d Cir.1992)).

There is no dispute that the parties entered into a security agreement prior to the commencement of the case, nor that Condor's security interest extends to the rents generated by Debtors' properties. Thus, Condor has established the first two elements of section 552(b). The only remaining issue is whether Condor perfected/enforced its interest in the subject rents.

■■■ As discussed *supra,* the applicable nonbankruptcy law in this instance is Alabama law. Although the law in Alabama is relatively undeveloped on this issue, the Court believes that a mortgagee is required to take an additional step such as foreclosure, sequestration of rents, or by having a receiver appointed to collect the rents, or some similar action in order to perfect a lien in rents generated by a mortgagor's property in Alabama.

■■■ Some courts take the position that an assignment of rents clause transfers the present legal right to rents to the mortgagee subject to a condition precedent that it shall take effect upon default. This is known as an absolute assignment of rents. Other courts hold that an assignment of rents clause simply creates a security interests in the rents, i.e. a collateral or conditional assignment of rents. The distinction is significant. If the assignment of rents is determined to be absolute, the rents are outside of the estate and the creditor may simply collect said rents. Paul P. Daily et al., *When Are They Cash Collateral?,* 379 Prac.L.Inst. 773 (1992). If however, the assignment of rents is a collateral assignment, the mortgagee may be required to take some affirmative action to enforce or perfect its security interest. *Id.* Such affirmative acts include taking possession of the subject property or filing an action to enforce the assignment. A close reading of the assignment of rents is required to distinguish an absolute assignment from a collateral assignment. *In re Galvin,* 120 B.R. 767, 770 (Bankr.D.Vt.1990).

According to Condor, the assignment of rents clause in the instant case is absolute, and, therefore, the Debtors' rights to said rents terminated upon default. To support its position, Condor relies upon the following language in the Mortgages:

4. That all rents, profits and income from the property covered by this Mortgage are hereby assigned to the Mortgagee for the purpose of discharging the debt hereby secured. Permission is hereby given to Mortgagor so long as no default exists hereunder, to collect such rents, profits and income;

Condor further cites and heavily relies upon the case of *HomeCorp v. Secor Bank,* 659 So.2d 15 (Ala.1994), in which the Supreme Court of Alabama held that a notice of default to the mortgagor's rental agent rendered the rents to be the property of the mortgagee as of the time that an uncured event of default occurred. Condor interprets this decision to provide that an assignment of rents becomes absolute upon a mortgagor's default at which time the mortgagee becomes entitled to the rents generated by the mortgagor's property from the date of default until foreclosure. The Court does not believe that *HomeCorp* can be cited for this proposition. The mortgage in *HomeCorp* specifically provided that the assignment of rent was "intended to be an absolute assignment from the Mortgagor to the Mortgagee and not merely the passing of a security interest." *Id.* at 18.

The mortgage in the instant case contains no such language. Indeed, a close reading of the mortgage indicates that the assignment of rents was intended only as security for the

debt. Paragraph one of the mortgage provides that it was given "for the purpose of securing the prompt payment of the indebtedness ..." Further, the assignment of rents provision specifically provided that the assignment was given "for the purpose of discharging the debt hereby secured." Mortgage, p. 4. Thus, the Court finds that the instant assignment of rents clause is distinguishable from *HomeCorp* in that it was not intended as an absolute assignment of rents, but merely a collateral assignment to secure the mortgages.

Moreover, despite the court's finding that the mortgage in *HomeCorp* contained an absolute assignment of rents provision, the court determined that the mortgagee was only entitled to the rents that accrued after the occurrence of an uncured event of default until foreclosure. In July of 1988, the mortgagor in *HomeCorp* began to pay its net operating cash flow to the mortgagee in lieu of the required monthly mortgage payments. In July of 1989, the mortgagee transmitted a demand letter accelerating the amount due under the note. Although the mortgage contained an absolute assignment of rents clause, the Alabama Supreme Court determined that the mortgagee was only entitled to the rents that began to accrue ten days after the mortgagee transmitted the demand letter to the mortgagor. The mortgagee was not entitled to the rents that accrued from July of 1988 until July of 1989.

 The Court notes that a Pennsylvania court recently held that postpetition rents are the exclusive property of the mortgagee in a title state where the mortgage contains an assignment of rents clause and the mortgagee makes a pre-petition demand for the rents. *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34 (3d Cir.1993). Like Pennsylvania, Alabama is a title theory state, "which means that legal title passes to the mortgagee upon execution of the mortgage." *Southern Bank of Lauderdale County v. Internal Revenue Service, et al.,* 770 F.2d 1001, 1003 (11th Cir.1985).[8] However, the Court believes that although Alabama is clearly a title theory state, Alabama case law, nevertheless, indicates, that some action by the mortgagee is required after the uncured event of default by the mortgagor occurs before the mortgagee shall be entitled to enforce its interest in rents.[9]

Although not precisely on point, the Court finds the case of *Farmers Nat'l Bank v. Abernathy,* 10 B.R. 418 (Bankr.M.D.Ala. 1981), very persuasive. In that case, the bankruptcy court found that the mortgagee had not perfected its interest in rent pursuant to section 552(b) of the Bankruptcy Code and applicable Alabama case law. Condor argues that this case is clearly distinguishable because the bankruptcy court found that the subject mortgage did not contain an assignment of rents provision. However, the Court believes that the case, nevertheless, provides guidance on the issue presented in this matter. In *Abernathy,* the court specifically found that under "applicable non-bankruptcy law found in Alabama case law ... until default and intervention by the mortgage holder, the rents received by the mortgagor ... are property of the mortgagor." *Id.* at 419 (citing *Lamar v. Johnson,* 16 Ala.

8. In a title theory state, mortgagors only hold an equitable interest in the mortgaged property. *Central Bank v. Thomas (In re Thomas),* 121 B.R. 94 (Bankr.N.D.Ala.1990). "The mortgagor is left with an equity of redemption, but upon payment of the debt, legal title revest in the mortgagor." *Southern Bank,* 770 F.2d at 1009 (citing *Trauner v. Lowrey,* 369 So.2d 531, 534 (Ala.1979). In a title state, the mortgagee has title, the right to possession, and absolute ownership rights in the mortgaged property. However, as a practical standpoint, the mortgagor remains in possession, even though the mortgagee has all of the incidents of ownership.

9. Although HUD filed a motion to lift the automatic stay with regard to Debtors' properties in the context of the Borden bankruptcy on September 12, 1991, the Court does not believe that said motion constitutes an act of perfection/enforcement. The motion to lift the stay was adjudicated by Judge Breland on February 19, 1992 during the Borden confirmation hearing. At the conclusion of the hearing, Judge Breland indicated to the parties his intent to confirm Borden's plan of reorganization. An order was never presented to Judge Breland because Borden agreed to remove the Debtors from the Plan upon the execution of the previously discussed Modification Agreements. Thereafter, neither HUD nor Condor pursued the motion to lift until Condor filed its motion for turnover on May 26, 1995.

App. 648, 81 So. 140 (1919), in which the Alabama court held that rent belongs to the mortgagor until the mortgagee takes some affirmative act of intervention after default occurs); *See also Zeidman v. Homestead Savings & Mortgage Co.*, 221 Ala. 386, 129 So. 281, 282 (1930) (providing that "it is well settled in this state that . . . the mortgagor is entitled to the rents from the mortgaged premises until there has been an intervention by the mortgagee"). In addition to Alabama case law requiring an act of intervention, the subject mortgage also contemplates the necessity of such action. Paragraph five (5) of the subject mortgage provides as follows:

> That upon default hereunder Mortgagee shall be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the party described herein and operate and collect the rents, profits and income therefrom.

Accordingly, the Court finds that the recordation of the mortgage, without further action, did not fully perfect Condor's interest in the subject postpetition rents. Thus, although the recordation of the mortgages created a security interest in the rents, this security interest was not perfected until Condor filed its motion for turnover on May 26, 1995. Condor does not hold a perfected security interest in said rents pursuant to applicable Alabama law. The subject accrued postpetition rents are property of the Debtors' estates.

An Order in accordance with this opinion will be entered.