This case involves a dispute between a mortgagor and a mortgagee over entitlement to (1) pre-foreclosure and post-foreclosure rents, issues, and profits from an apartment complex; (2) security deposits paid by tenants who continued in possession after foreclosure; *Page 16 
and (3) ad valorem taxes that had been escrowed but not paid.
One of the principal issues presented is the legal effect of a "nonrecourse" provision in the mortgage and loan agreements. The trial court interpreted the provisions of the agreement in favor of the mortgagee and entered a summary judgment against the mortgagor and its property manager.
Secor Bank (formerly Alabama Federal Savings and Loan Association) is a federally chartered thrift institution and successor party to a December 23, 1985, loan agreement whereby a $3,000,000 loan was made to Sandpiper Associates, Ltd. ("Sandpiper"), to purchase the Sandpiper Apartments. In November 1988, Sandpiper designated HomeCorp, a corporation, as its agent to manage the Sandpiper Apartments. Under the management agreement, HomeCorp assumed, among other responsibilities, the obligations to collect the rents and to pay the operating expenses, the monthly mortgage payments, and the real estate taxes.
Under the terms of the promissory note, Sandpiper was required to pay a monthly installment of $24,496 to Secor. The monthly payments were made on a regular basis until July 1988. Beginning with the July 1, 1988, payment, HomeCorp paid only an amount equal to the net operating cash flow generated by the apartments for the previous month. In November 1988, it made no payment.
By letter dated July 5, 1989, Secor notified both HomeCorp and Sandpiper that Sandpiper was in default in making the payments due under the mortgage note. The letter referred to a provision in the mortgage providing that the rents could be intercepted in the event of default and applied to reduce the indebtedness. The same letter stated:
 "This is formal notice to you to withhold payment of any rents to any party other than Secor Bank until you have been advised further."
On July 11, 1989, Secor's counsel informed Sandpiper that Secor was taking over the rentals of Sandpiper Apartments effective July 1, 1989, and that it would be responsible for operating expenses beginning July 1, 1989, upon receiving the rents beginning that date.
On July 14, 1989, Secor notified Sandpiper again of monetary defaults in the payments required of Sandpiper under the promissory note secured by the mortgage against the Sandpiper Apartments. This letter referred to the requirement that all monetary defaults be cured within 10 days and advised Sandpiper that Secor intended to declare all indebtedness payable under the promissory note due and payable and to take the necessary steps to protect its interest in the Sandpiper Apartments.
The next letter relevant to the issues in this case is the July 19, 1989, letter from Secor to HomeCorp again notifying HomeCorp to withhold payment of any rents to any party other than Secor except that the letter authorized HomeCorp to pay customary and necessary expenses incurred in the management of the apartments from rents withheld from July 1 forward.
HomeCorp continued collecting rents from the tenants of the Sandpiper Apartments from July 1, 1989, to September 7, 1989, that last date being the date when the foreclosure sale under Secor's mortgage took place. HomeCorp also continued paying current operating expenses from those funds. On November 1, 1989, Secor requested from HomeCorp "any cash funds . . . [including] operating and escrow deposits" that it held "in the name of Sandpiper Apartments." Sandpiper subsequently refused Secor's demand, contending that Secor was not legally entitled to the funds. Based on Sandpiper's directions, HomeCorp also refused, and it turned over $24,500 to Sandpiper's counsel in December 1989; that was all of the funds held by HomeCorp that had not already been paid for expenses or otherwise distributed. Secor sued, seeking the net rents, issues, and profits from the Sandpiper Apartments, the security deposits collected from the tenants of the Sandpiper Apartments, and reimbursement of the ad valorem taxes that Secor had to pay that were due for three years ending September 30, 1988, 1989, and 1990, plus interest and penalties, in order to redeem the Sandpiper Apartments from a tax sale to the State of Alabama. *Page 17 
Sandpiper counterclaimed, alleging that Secor had improperly interfered with Sandpiper's contractual relationship with HomeCorp and that Secor had improperly induced Sandpiper to continue holding the property while Secor pursued a sale to a potential buyer; that sale ultimately was not consummated.
On November 17, 1992, the trial court entered a summary judgment in favor of Secor with respect to its claims against HomeCorp and Sandpiper. That summary judgment provided:
 "(1) The assignment of the rents by Sandpiper to Secor became absolute upon the occurrence of an uncured event of default on the part of Sandpiper;
 "(2) Secor became entitled to all rents collected from tenants of the Sandpiper Apartments after such occurrence;
 "(3) Secor is entitled to recover from HomeCorp and Sandpiper all rents collected from tenants after the effective date of the assignment subject to amounts necessarily paid for the operation, maintenance and upkeep of the Sandpiper Apartments from that date forward;
 "(4) Secor is entitled to recover from Sandpiper the amounts plus interest and penalties, of all ad valorem taxes accrued and unpaid to the date of foreclosure to the extent that Sandpiper had income available for the payment of such ad valorem taxes and instead distributed such income to the partnership and partners;
 "(5) Secor has standing to make a claim against and to recover from HomeCorp and Sandpiper the amounts representing the total of all security deposits received from tenants of the Sandpiper Apartments."
The trial court also entered a summary judgment for Secor with respect to Sandpiper's counterclaim, holding that Count II failed to state a claim for which relief can be granted and that no evidence had been produced in support of the other claims set out in the counterclaim. The trial court also stated that the issues with respect to the amounts recoverable under each of the plaintiff's claims would be determined at trial.
After a nonjury trial, the court determined that Secor was entitled to rents collected from tenants of the Sandpiper Apartments after July 24, 1989, subject only to amounts required to pay operating expenses. The total amount paid by HomeCorp to Sandpiper from the rents collected is $25,860.17 ($24,500.00 on December 14, 1989, and $1,360.17 on January 4, 1991). Sandpiper's operating statements show that the total net cash flow retained by Sandpiper for the period from January 1989, through September 1989, was $107,911. However, the same operating statements show that Sandpiper made capital expenditures during the same period for improvements to the Sandpiper Apartments in the total amount of $80,500. The difference of $27,411 approximates the amount paid by HomeCorp to Sandpiper. In conclusion, the trial court determined that the total liability to Secor was as follows: $74,260.29, the amount paid by Secor to redeem Sandpiper Apartments from 1988 property taxes; $11,510.00, security deposits collected from tenants of Sandpiper Apartments by HomeCorp and remitted to Sandpiper; and $25,860.17, the net rents collected from tenants by HomeCorp and paid to Sandpiper under the assignment of rents provision.
Rule 56, A.R.Civ.P., sets forth a two-tiered standard for entering a summary judgment. The rule requires the trial court to determine (1) that there is no genuine issue of material fact, and (2) that the moving party is entitled to a judgment as a matter of law. The burdens placed on the moving party by this rule have often been discussed by this Court:
 " 'The burden is on one moving for summary judgment to demonstrate that no genuine issue of material fact is left for consideration by the jury. The burden does not shift to the opposing party to establish a genuine issue of material fact until the moving party has made a prima facie showing that there is no such issue of material fact. Woodham v. Nationwide Life Ins. Co., 349 So.2d 1110 (Ala. 1977); Shades Ridge Holding Co. v. Cobbs, Allen Hall Mortg. Co., 390 So.2d 601
(Ala. 1980); Fulton v. Advertiser Co., 388 So.2d 533
(Ala. 1980).' " *Page 18 
Berner v. Caldwell, 543 So.2d 686, 688 (Ala. 1989) (quotingSchoen v. Gulledge, 481 So.2d 1094 (Ala. 1985)).
The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law. Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758
(Ala. 1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381
(Ala. 1986). See also Hanners v. Balfour Guthrie, Inc.,564 So.2d 412 (Ala. 1990).
Because this action was not pending on June 11, 1987, Ala. Code 1975, § 12-21-12, mandates that the nonmovant meet its burden by "substantial evidence." Bass v. SouthTrust Bank ofBaldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Under the substantial evidence test, the nonmovant must present "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
The defendants argue on appeal that "all personal liability claims against the defendants are barred by the nonrecourse clause set forth in Mortgage § 5.11, the Loan Agreement and the Mortgage Note." Specifically, they argue that the trial court erred in interpreting the phrase "and the income therefrom" contained within § 5.11 to entitle Secor to "all amounts collected by HomeCorp and Sandpiper, less amounts paid for the operation, maintenance and upkeep of the Sandpiper Apartments." The appellants argue that the trial court should have interpreted the provision as providing that Secor, upon Sandpiper's default, was free to foreclose and then, as post-foreclosure title-holder to the property, look to the property's rents, issues, and profits from the foreclosure day onward. Secor argues that "Sandpiper contracted away its rights to the income, issues and profits to pay the debt it owed to Secor with its obligation being 'non-recourse', and more importantly irrevocably designated Secor as its attorney-in-fact to collect the rents, issues and profits for the mortgaged property." Paragraph 2.01 of the mortgage deed refers to the assignment of rents by Sandpiper to Secor:
 "2.01 Assignment of Rents. Mortgagor hereby assigns and transfers to Mortgagee all the rents, issues and profits of the Mortgaged Property, and Hereby gives to and confers upon the Mortgagee the right, power and authority to collect such rents, issues and profits. Mortgagor irrevocably appoints Mortgagee its true and lawful attorney-in-fact at the option of Mortgagee at any time and from time to time, to demand, receive and enforce payment, to give receipts, releases and satisfactions, and to sue, in the name of the Mortgagor or Mortgagee, for any such rents, issues and profits and provided, however, that Mortgagor shall have the right to collect such rents, issues and profits (but not more than two months in advance) prior to or at any time there is not notice of an event of default under this Mortgage, the Note, the Loan Agreement and a guaranty of such documents and any other instruments given as evidence to further secure the payment and performance of any obligation secured by this Mortgage (which documents collectively are sometimes hereinafter referred to as 'Loan Instruments'). The assignment of the rents, issues and profits of the Mortgaged Property in this Article II is intended to be an absolute assignment from the Mortgagor to the Mortgagee and not merely the passing of a security interest. The rents, issues and profits are hereby assigned absolutely by Mortgagor to Mortgagee contingent only upon the occurrence of an uncured event of default under any of the Loan Instruments."
Section 5.11 states, in pertinent part:
 "Exculpatory Clause: Notwithstanding any terms or provisions of the Note, Loan Agreement, Mortgage, Security Agreement and Assignment of Rents and Leases ('Mortgage'), or any other agreement or instrument relating to or securing the payment *Page 19 
of the Note, neither the Mortgagor nor any partner, officer, nor affiliate thereof shall have any personal liability under the Note, the Loan Agreement, the Mortgage, or for any obligation arising thereunder, it being expressly agreed by the Mortgagee and any Mortgagee thereof that its sole recourse for payment of the indebtedness and any obligations evidenced by any of said instruments, shall be the Mortgaged Property, and the income therefrom, including without limitation, policies of hazard insurance as maintained on the Mortgaged Property, and any proceeds thereof, and the award of any damages for the taking of or injury to the Mortgaged Property to the extent provided in the Mortgage. This clause shall not impair the validity of the indebtedness evidenced by the Note, the Loan Agreement or the Mortgage or the right of the Mortgagee of the Mortgage to foreclose the same following an uncured default by the Mortgagor in the making of the payments provided by the Note; provided, however, that the Mortgagee and any Mortgagee thereof may not seek or obtain any deficiency judgment or other monetary obligation against Mortgagor or any partner, officer of affiliate thereof. . . ."
In the trial court, the defendants relied heavily onZeidman v. Homestead Savings Mortgage Co., 221 Ala. 386,129 So. 281 (1930), to support their claims; they rely on that case here to argue for a reversal of the judgment. They argue that Secor had no right to the rents collected by the rental agent from the day of default to the day of foreclosure.
The trial judge drafted a lengthy order in the case, and the following portion of his order shows how he distinguished theZeidman case:
 "In Zeidman, Homestead Savings Mortgage Company held mortgages on an apartment house. On December 21, 1927, after the indebtedness secured by the mortgages became due, Homestead placed the mortgages with an attorney for foreclosure and also contacted the rental agent, demanding that the rents in the hands of the rental agent be paid to it. Zeidman, the owner, filed suit, making claim for the rents paid prior to the foreclosure sale. Reversing the judgment of the trial court in favor of Homestead, the supreme court held that the rents collected prior to foreclosure belonged to Zeidman, the owner. The supreme court held that only when Homestead had actively intervened by notice to tenants advising them to pay the rents to it or by the appointment of a receiver, could Homestead demand and keep the rents. However, there was no reference in the supreme court opinion [to] any provision in the mortgage or any other instrument providing for the assignment of the rents to Homestead.
 "In the present case, Paragraph 2.01 provides specifically that there is an absolute assignment of the rents from Sandpiper to Secor and not merely the passing of a security interest. Sandpiper made an irrevocable appointment of Secor as its attorney-in-fact at Secor's option to enforce payment of the rents. The last sentence of Paragraph 2.01 states:
 " 'The rents, issue[s] and profits are hereby assigned absolutely by Mortgagor to Mortgagee contingent only upon the occurrence of an uncured event of default under any of the Loan Instruments.'
 "The July 14, 1989, letter from Secor notified Sandpiper that Sandpiper had been in monetary default for a number of months. The letter also stated in part:
 " 'This is to further advise you that in the event all monetary default [sic] have not been cured within ten days then the mortgagee intends to declare all due and payable and will take the necessary steps to proceed to protect its interest in the mortgaged properties.'
 "Under Paragraph 4.02, the mortgagee may declare all indebtedness due and payable in the event of a monetary default which remains uncured after ten days' written notice to the mortgagor.
 "Whether or not the July 5, 1989, letter gave notice of default, there can be no question . . . that there was an uncured event of default as defined in Paragraph 2.01 of the instrument ten days after the *Page 20 
delivery of the July 14, 1989, letter. Under the terms of Paragraph 2.01, the assignment then became absolute, and the rents, issues and profits then belonged to Secor.
 "Sandpiper and HomeCorp also say that Paragraph 2.02 of the mortgage and loan agreement establishes the procedure which Secor must follow in order to collect the rents. Under Paragraph 2.02, Secor may either itself or by receiver enter into possession of the mortgaged property and in its own name sue for or otherwise collect the rents. Paragraph 2.02 is the standard type of provision found in mortgages on rental property. However, Paragraph 2.02 is not necessarily the exclusive remedy. Paragraph 4.05 expressly provides that 'no remedy conferred in the instrument is exclusive of any other remedy, . . .' but each shall be cumulative."
(Emphasis in original.) The trial court did note that § 5.11 did restrict Secor's recourse, upon default and proper notice, to
 "the Mortgaged Property, and the income therefrom, including without limitation, policies of hazard insurance as maintained on the Mortgaged Property, and any proceeds thereof, and the award of any damages for the taking of or injury to the Mortgaged Property to the extent provided in the Mortgage."
Secor contends that under its designation as an irrevocable attorney-in-fact it had the right to intervene between Sandpiper and the rental agent, HomeCorp, to intercept the rents, issues, and profits.
We conclude that the trial judge properly interpreted the agreements to provide an assignment of the rents from Sandpiper to Secor and to make an irrevocable appointment of Secor as Sandpiper's attorney-in-fact, at Secor's option, to enforce payment of the rents.
The trial court determined that under the terms of Paragraph 2.01, the assignment, upon declaration of default, became absolute, and that the rents, issues, and profits then belonged to Secor. The record supports that conclusion. By letter dated July 14, 1989, Secor gave notice of default and advised Sandpiper of its intent to declare all indebtedness due and payable, and gave notice that it would take the necessary steps to proceed to protect its interest in the mortgaged properties. The trial court correctly concluded that there was an uncured event of default as defined in Paragraph 2.01 of the instrument 10 days after delivery of the July 14, 1989, letter.
The defendants contend that Paragraph 2.02 of the mortgage and loan agreement establishes the procedure that Secormust follow in order to collect the rents. However, the trial court rejected this argument, properly concluding that under Paragraph 2.02, Secor may either itself or by receiver enter into possession of the mortgaged property and in its own name sue for or otherwise collect the rents. Where there has been an absolute assignment of the rents, the assignee has the right to demand the rents from the tenants or from the assignor.
After paying expenses incurred in connection with the management of the Sandpiper Apartments, HomeCorp paid over to Sandpiper the balance of the rents collected, disregarding the notice from Secor demanding the rents as assignee. The trial court correctly held that Secor is entitled to recover from HomeCorp and Sandpiper all rents collected from tenants after the effective date of the assignment, subject to amounts necessarily paid for the operation, maintenance, and upkeep of the Sandpiper Apartments from that date forward.
Next, the defendants argue that the trial court erroneously held that Secor was entitled to all security deposits received by HomeCorp and Sandpiper. The trial court concluded that, following the foreclosure of the mortgage, Secor necessarily assumed the obligations of the landlord under the leases with the tenants of the Sandpiper Apartments, including the obligation to repay any security deposits that had been made by tenants, upon the termination of the leases. The trial court also concluded that even if Secor was not legally obligated to refund the security deposits to those tenants entitled to them, Secor had an interest to protect by doing so and could not be regarded as a volunteer. The trial court correctly held that *Page 21 
Secor is entitled to recover the total amount of the security deposits paid to Sandpiper.
Finally, the defendants argue that the trial court erroneously held that Secor was entitled to all net rents, issues, and profits not applied to the payment of the 1988 ad valorem taxes and 1989 ad valorem taxes, which had been escrowed out of the operating fund.
The trial court concluded that "[u]nder the express terms of the mortgage and loan agreement, Sandpiper assumed the obligation to pay the ad valorem taxes assessed against the Sandpiper Apartments not later than ten days prior to the due date, or December 21, 1988." The defendants represented to Secor that they would pay ad valorem taxes; however, they failed to do so.
Paragraph 1.08(a) of the mortgage deed provides in pertinent part as follows:
 "(a) Mortgagor agrees to pay, at least ten days prior to delinquency, all real property taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever . . . ."
By letter dated November 16, 1988, First Equities, Sandpiper's general partner, informed Secor that it had received a net cash flow of $13,570.16 and that
 "Due to the reassessment of property values by Jefferson County in 1988, the net cash flow for October is being utilized to cover the shortage in property tax expense accrued to date."
However, Sandpiper did not pay the ad valorem taxes due for the year ending September 30, 1988, nor did it pay the ad valorem taxes for any succeeding year. Sandpiper's operating statement for October 1988 indicated a "Real Estate Taxes (escrow)" of $31,105. The 1988 pro forma statement or projection listed a monthly payment of $3,083 under "Real Estate Taxes (escrow)" for each month during 1989, with a total amount of $37,000 to be placed in escrow. The financial operating statement of Sandpiper for the month of February 1989 also indicated that funds were being held from the net operating cash flow for payment of ad valorem taxes into escrow in the amount of $7,353. Even though Sandpiper listed amounts as being held in escrow for real estate taxes, Sandpiper never paid the 1988 ad valorem taxes. As a result, the Sandpiper Apartments were sold to the State of Alabama to pay the taxes. In order to redeem the apartments, Secor had to pay $52,202.29 in taxes, interest, and penalty to the State of Alabama.
Based upon these facts, the trial court correctly held that Secor is entitled to recover from Sandpiper; its general partner, First Equities; and the general partners of First Equities, the amount that Secor was required to pay to the State of Alabama in full payment of the 1988 property taxes.
For the foregoing reasons, we conclude that the trial court properly entered the summary judgment in favor of Secor. As to the amount of damages determined by the trial court, we note the presumption of correctness applicable to the trial court's finding of facts based on ore tenus evidence. Lynaum FuneralHome, Inc. v. Hodge, 576 So.2d 169 (Ala. 1991).
The judgment of the trial court is due to be affirmed.
AFFIRMED.
HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.