GULF LIFE INSURANCE COMPANY, INC., Plaintiff,

v.

WAL–MART STORES, INC., Defendant/Third Party Plaintiff,

v.

TROY PLAZA ASSOCIATES LTD. and F.F. Center Holding Corp., Third Party Defendants.

Civil Action No. 94–T–1139–N.

United States District Court, M.D. Alabama, Northern Division.

Aug. 15, 1997.

James J. Robinson, James A. Taylor, Jr., Reid S. Manley, Burr & Forman, Birmingham, AL, for Plaintiff.

T. Randall Lyons, H. E. Nix, Jr., Nix, Holtsford & Vercelli, P.C., Montgomery, AL, Dwayne R. Snyder, Montgomery, AL, for Defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiff Gulf Life Insurance Company, Inc. brought this lawsuit under the court's diversity-of-citizenship jurisdiction, 28 U.S.C.A. § 1332, against defendant Wal–Mart Stores, Inc. Gulf Life was the holder of a mortgage, collaterally secured by an assignment of leases, on a shopping center in Troy, Alabama. Wal–Mart was a tenant in the shopping center. Gulf Life seeks to re-

cover from Wal–Mart, in accordance with the assignment, rents for the period from May 1992, when the mortgagor and owner of the shopping center, F.F. Center Holding Corporation, defaulted on the mortgage, until January 1993, when Gulf Life finally foreclosed on the mortgage. Wal–Mart in turn filed a third-party complaint against Troy Plaza Associates, Ltd. ("TPA") to whom it had paid rent during that period. Wal–Mart then amended the third-party complaint to add F.F. Holding as a third-party defendant, upon discovering that F.F. Holding was in fact TPA's successor as owner and mortgagor of the shopping center, and that TPA had been forwarding all of Wal–Mart's rent payments to F.F. Holding during the relevant time period. Wal–Mart seeks compensation from them for any amount it may be obligated to pay Gulf Life. However, F.F. Holding was never successfully served with the third-party complaint or any other pleadings or orders in this case, and must be assumed to have fallen by the wayside.[1]

The parties eventually stipulated that the case should be decided on the basis of the motions for summary judgment and the evidentiary record under submission, and so the trial was continued generally. This matter is therefore now before the court on the following motions: (1) Gulf Life's motion for summary judgment against Wal–Mart, filed on July 12, 1995; (2) Wal–Mart's counter motion for summary judgment against Gulf Life, filed on August 11, 1995; (3) TPA's motion for summary judgment against Wal–Mart, filed on September 18, 1995; and (4) Wal–Mart's counter motion for summary judgment motion against TPA, filed on October 6, 1995.[2] For the reasons that follow, the court concludes that Gulf Life's summary-judgment motion should be denied, and Wal–Mart's counter motion should be granted. Moreover, in light of this ruling, the motion by TPA and the counter motion by Wal–Mart are due to be denied as moot.

---

1. More's the pity, since this case really is about Gulf Life trying to recover money that fell into the hands of F.F. Holding.

2. Wal-Mart originally filed a motion for summary judgment against Gulf Life, raising only the argument that the *form* of notice it received was

insufficient. That motion was finally denied, by order dated December 22, 1994. The current counter motion responded to, and raised, additional arguments not broached by that summary-judgment motion.

## I. BACKGROUND

The history of how each of the parties became interested in the Troy Plaza shopping center is pivotal for understanding their positions in this lawsuit. Therefore, that history will first be reviewed in some detail.

L.L. Dozier and Mary Nell Dozier, the owners of a fee-simple estate in a plot of land in Troy, Alabama, furnished a "ground lease"[3] on that land to Independent's Troy, Inc. ("ITI") on November 24, 1970.[4] The Doziers and ITI together took out a mortgage on December 9, 1970, from Hamilton National Bank of Chattanooga, Tennessee, to finance the cost of the improvements, i.e. the shopping center, built upon that land by ITI. The mortgage note was secured by the land and the improvements upon it.

ITI had already sublet portions of the shopping center to tenants, including S.H. Kress on November 11, 1970, as modified on February 18, 1971. S.H. Kress operated a supermarket on the premises that would eventually be leased to Wal–Mart.

Certain modifications were made to the mortgage on February 1, 1972, by an "extension and modification agreement." The modification agreement declared that the Doziers are the owners of the real estate, and that ITI is the "lessee and owner of the leasehold estate in said real estate." The Doziers and ITI, in that instrument, further covenanted that "they are lawfully seized, in fee simple and of the entire leasehold interest and estate, respectively."

Also on February 1, 1972, as part of the purchase of the mortgage indebtedness by Interstate Life and Accident Insurance Company from Hamilton Bank, ITI executed an "assignment of leases," as additional, or collateral, security for the mortgage. The assignment of leases gave Interstate Life an interest in rents due under the leases between ITI (the lessor) and the tenants of the shopping center (the lessees). Interstate Life's right to collect rents would not vest "unless and until [ITI] defaults in the performance of the terms and conditions" of the mortgage note or the assignment of leases. The assignment further states:

"The Assignor, in the event of default . . . hereby authorizes the Assignee, at its option, to enter and take possession of the mortgaged premises and/or at its option, to collect the rents, income and profits under said lease[s], to exercise all the rights and privileges of the Assignor thereunder, and until foreclosure of said Mortgage, to apply the net rentals . . . to the sum due to said Assignee under the terms and conditions of said Note and Mortgage. . . . Such entry and taking possession of the mortgaged premises and/or collection of rents, may be made by actual entry and possession or by written notice served personally upon, or sent by registered mail to, the last owner of the leasehold estate of the mortgaged premises appearing on the records of the Assignee, as the Assignee may elect, and no further authorization shall be required."

In the context of the mortgage purchase, the assignment could be viewed to read as follows:

"The [mortgagor, ITI], in the event of default . . . hereby authorizes the [mortgagee, Interstate Life], at its option, to enter and take possession of the mortgaged premises and/or at its option, to collect the rents, income and profits under said lease[s], to exercise all the rights and privileges of [ITI] thereunder, and until foreclosure of said Mortgage, to apply the net rentals . . . to the sum due to [Interstate Life] under the terms and conditions of said Note and Mortgage. . . . Such entry and taking possession of the mortgaged premises and/or collection of rents,

---

**3.** A ground lease is a device whereby the owner of undeveloped land executes a long-term lease of the land to another party who agrees to improve the land by building upon it, usually to sublease the improvements to other parties. The owner of the land receives value for the lease, in the form of a portion of the rent paid by those tenants, and agrees to help secure the funds needed to improve the land by including the fee simple in the mortgage taken out by the holder of the ground lease. *See, e.g., Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co.,* 390 So.2d 601, 605–06 (Ala.1980).

**4.** *See Arlen Realty, Inc. v. Dozier,* 393 So.2d 489, 490 (Ala.Civ.App.1980), *writ denied,* 393 So.2d 492 (Ala.1981).

may be made by actual entry and possession or by written notice served personally upon, or sent by registered mail to, the last owner of the leasehold estate of the mortgaged premises appearing on the records of [Interstate Life], as [Interstate Life] may elect, and no further authorization shall be required."

In the assignment, ITI further "covenants and represents that [it] is the absolute owner of such leases with full right and title to assign the same." [5]

On December 5, 1973, ITI signed a 20-year lease for a portion of the shopping center with Kuhn's Big–K Corporation ("Big–K"), where it would operate a department store. Big–K was directed in ¶ 4 of the lease to make rents payable to the order of ITI, "until Lessee is directed to do otherwise by Lessor." Further on, in ¶ 28, the lease states that "the term 'Lessor' as used in this lease means only the owner or the mortgagee in possession for the time being of the building in which the Leased premises are located or the owner of a leasehold interest in said building and/or the land thereunder."

The mortgage, the assignment, and the lease all state that their terms and conditions will remain binding upon all successors or assigns of the parties to them.

After L.L.Dozier passed away, his wife and children, the heirs to the fee in the land underlying the shopping center, executed a Non–Disturbance and Attornment Agreement, also involving ITI, Interstate Life, and Big–K, on June 19, 1979. In this document, among other things, Big–K agreed to attorn to Interstate Life in the event of a foreclosure sale after default upon the mortgage.

ITI dissolved some time shortly thereafter, and its interest in the shopping center came to be held by Arlen Realty, Inc. Litigation

arose after Arlen Realty became delinquent in its rent payments to the Doziers, and the Doziers sought to terminate the ground lease. Interstate Life also activated its right to receive rent payments directly from the tenants in the shopping center. Arlen Realty paid into court all rents due, and filed a petition for declaration of its rights under the ground lease. The court ruled that Arlen Realty had not been given proper notice and opportunity to cure as required by the lease, and thus the Doziers could not terminate.

The lease on the land, and ownership of the shopping center, later came to be in the hands of The Broadstone Group, and then Corporate Investments. By the time Corporate Investments owned what had once been ITI's interest in the property, that interest and the fee-simple estate in the land had merged into one estate. Thus, when TPA purchased the property from Corporate Investments on January 1, 1984,[6] by executing a note secured by a wraparound, junior mortgage,[7] it too acquired all of the interests originally belonging to both the Doziers and ITI, and became the absolute owners of the property, and the landlord and lessor of all the tenants in the shopping center.

In 1991, TPA transferred its interests in the property to Troy B.S. Corporation, which shortly thereafter reconveyed the property to F.F. Holding. Gulf Life, by merger, later succeeded to Interstate Life's interest as mortgagee, and so came to hold the assignment that ran with the mortgage as well. Wal–Mart later acquired Big–K, and took over the latter's lease in the shopping center by an amendment to the lease dated April 5, 1982.[8] During the entire period for which Gulf Life seeks rents in this lawsuit, F.F. Holding was the owner of the shopping center and landlord of the premises leased to Wal–Mart. In fact, by 1992, Wal–Mart was

---

**5.** The assignment covers "leases listed ... together with any future modifications, extensions and renewals ... also together with any and all other leases now existing or hereafter made ... for the whole or any part of the ... mortgaged premises, and any modification ... thereof." Plaintiff's Motion for Summary Judgment, Ex. A (Assignment of Leases), at p. 1.

**6.** According to Wal–Mart, its obligation to pay rent to TPA was created by an amendment to its

lease dated August 7, 1986. The difference in these dates has no effect on this lawsuit.

**7.** This mortgage was subordinate to the original mortgage taken out by the Doziers and ITI, which included the Assignment of Leases.

**8.** The Broadstone Group was Wal–Mart's lessor at that time.

one of the few remaining tenants in the shopping center.

Although TPA notified Wal–Mart by letter when the property was sold to Troy B.S. Corporation in August of 1991, and Wal–Mart was again notified, by certified letter from TPA on January 13, 1992, when the property was sold again, to F.F. Holding, it continued at all relevant times to pay rent to TPA. TPA, on its own initiative, deposited Wal–Mart's rent checks, and issued and forwarded checks in identical amounts to F.F. Holding on Wal–Mart's behalf.

In late March or early April of 1992, Gulf Life wrote to TPA to notify it of default on the payment of the mortgage, and to inform it that Gulf Life would seek to take additional steps to protect its interests unless the default were promptly cured. TPA wrote back to Gulf Life, saying that the property was now · owned by F.F. Holding. Gulf Life, through its attorney, then sent a letter with notice of the default to F.F. Holding on May 5, 1992, which was similar to the letter sent earlier to TPA. Gulf Life wrote again to F.F. Holding on November 24, 1992, and December 11, 1992, notifying it of its election to proceed to foreclosure sale of the property.[9]

Gulf Life also wrote to and telephoned the tenant Wal–Mart several times in April and May of 1992, and furnished it with a copy of the assignment, demanding that Wal–Mart commence making rent payments directly to Gulf Life. Similar demands upon the other tenants in the shopping center did result in their paying rents directly to Gulf Life.

Despite those demands, and regardless of any contrary representations or assurances it may have given Gulf Life during those telephone conversations, Wal–Mart continued to pay rent, as before, to TPA. Gulf Life made additional demands upon Wal–Mart for rents about six months later, in November 1992, and finally brought this lawsuit to recover rents from Wal–Mart from the time it first contacted Wal–Mart in the spring of 1992 until and through the end of 1992, when it eventually foreclosed on the mortgage held by F.F. Holding.

## II.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The parties agree that, in this case, the facts have been stipulated to; it is, instead, primarily their interpretations of certain legally-operative phrases in documents governing and describing their relationships and transactions that divide the parties. The parties have, therefore, agreed that the case should be decided solely on the basis of these motions, without trial.

## III.  DISCUSSION

In terms of the 1972 assignment, Gulf Life came to occupy the position once held by Interstate Life, and F.F. Holding stepped into the shoes once filled by ITI, so that, at the time Gulf Life brought suit, the assignment could be read as follows:

"The [mortgagor, F.F. Holding], in the event of default ... hereby authorizes the

---

**9.** Since F.F. Holding never appeared in this case, it is unclear whether it received any of these letters.

[mortgagee, Gulf Life], at its option, to enter and take possession of the mortgaged premises and/or at its option, to collect the rents, income and profits under said lease[s], to exercise all the rights and privileges of [F.F. Holding] thereunder, and until foreclosure of said Mortgage, to apply the net rentals ... to the sum due to [Gulf Life] under the terms and conditions of said Note and Mortgage.... Such entry and taking possession of the mortgaged premises and/or collection of rents, may be made by actual entry and possession or by written notice served personally upon, or sent by registered mail to, the last owner of the leasehold estate of the mortgaged premises appearing on the records of [Gulf Life], as [Gulf Life] may elect, and no further authorization shall be required."

Gulf Life contends that the 1972 assignment permits it, the mortgagee, in the event the owner of the shopping center, the mortgagor, defaults on the terms of the mortgage, to collect rents directly from the tenants of the shopping center as soon as Gulf Life informs them of the default. Gulf Life wants rents from Wal–Mart from the time F.F. Holding defaulted on the mortgage, and Gulf Life notified Wal–Mart of that default, until Gulf Life finally foreclosed on the shopping center.

Wal-Mart contends that, according to the 1972 assignment, the mortgagee must inform *the mortgagor*, in no uncertain terms, both that a default has occurred, and that the mortgagee has elected, and now wishes to exercise, its right to collect rents directly from the tenants. Wal–Mart further asserts that, according to its lease, it is obligated to continue to pay rent to the mortgagor, its lessor, until the mortgagor informs it otherwise. Thus, in Wal–Mart's view, upon receiving notice of default and the mortgagee's election of remedies, it is incumbent upon the mortgagor to tell the tenants to pay rent to the mortgagee. Wal–Mart says that neither

of these things happened, and so through the fault of either the mortgagee, or the past and present mortgagors, it never became obligated to pay rent directly to Gulf Life.

A.

■ A primary issue between Gulf Life and Wal–Mart is the meaning and effect of a provision in the 1972 assignment requiring that the last "owner of the leasehold estate of the mortgaged premises" who the mortgagee has on its records be informed, by personal service or certified mail, of the mortgagee's election to exercise its right to collect rent directly from tenants upon default by the mortgagor.

The position of Gulf Life is that the owner of the leasehold estate, who it must inform, pursuant to the assignment, before it may invoke its right to collect rents from Wal–Mart, is Wal–Mart itself, and that by several letters and phone calls it did provide sufficient actual notice to Wal–Mart of that invocation. Gulf Life further argues that, by acknowledging receipt of those notice letters from Gulf Life, Wal–Mart waived the forms of notice required in the agreement, because their purpose, providing guarantee of actual notice to the tenant, has been served. Gulf Life refers to a number of cases on the notice requirement in a remedial provision of the Miller Act, 40 U.S.C.A. §§ 270a–270d (West 1970), in support of its argument that actual notice is a sufficient and effective substitute for formal notice.[10]

Gulf Life makes several arguments to support its position. First, in its motion for summary judgment, it argues that the owner of a leasehold estate is the lessee. Originally, ITI held a ground lease, and was thus an owner of a leasehold estate. When the interests of ITI's successors merged with the Doziers' interest in the land, that leasehold estate merged into and with the fee simple. From then on, the owners held an absolute fee, and the only remaining leasehold estates

10. *Fleisher Eng'r & Constr. Co. v. United States ex rel. Hallenbeck,* 311 U.S. 15, 61 S.Ct. 81, 83, 85 L.Ed. 12 (1940); *Hillsdale Rock v. Cortelyou,* 581 F.2d 239 (9th Cir.1978); *Liles Constr. Co. v. United States,* 415 F.2d 889, 890 (5th Cir.1969). Gulf Life cites no relevant Alabama or Eleventh Circuit cases. Whether judicial interpretations of the purpose behind this specific statutory notice requirement are relevant to understanding the purposes these parties' predecessors had when including an explicit notice provision in their contract is questionable.

were those of the tenants in the shopping center. Thus the tenants were the only candidates left to be "owners of the leasehold estate" who had to be notified of the mortgagee's intention to collect rents directly, according to Gulf Life.

■■ Gulf Life makes this argument despite having stipulated, in the pre-trial order in this court, that on the date the assignment was executed ITI alone was the owner of the leasehold estate of the mortgaged premises.[11] To be consistent, Gulf Life would have to argue that, at the very least, ITI, along with all the tenants in the shopping center, were owners of leasehold estates at that time. Even then, the argument would be very weak. Once Gulf Life concedes that ITI was even *one* of the owners of a leasehold estate in the mortgaged premises, as described in the assignment, it must also concede that the notice provision in the assignment was not strictly a measure directed at those whose rents would become payable to Gulf Life, since the ground lease held by ITI was *not* one of those assigned; and moreover, if ITI *ever* had to be notified of the mortgagor's intent to collect rents upon default of the mortgage, then, since the assignment clearly states that its terms are binding on successors, Gulf Life must further concede that it would be required to notify ITI's successors, whoever they may be, of a default, regardless of whether it would also have to notify current tenants. This duty would not be extinguished by the fact that ITI's interests merged with those of the owner of the land, since the assignment does not so provide. Notice to the tenants would never substitute for notice to ITI or its successors, since the tenants' and ITI's interests in the property *never* merged. Merger of ownership of the leasehold estate with ownership of the fee in land may have unified interests previously held separately; but it did not destroy anyone's interests in the leasehold estates that existed by virtue of ITI's (and later, TPA's, and ultimately, F.F. Holding's) continued leasing of portions of the premises to tenants, and Gulf Life has offered no rationale as to why ITI would have contracted to receive notice solely in its capacity as lessee of the ground lease, and not in its position as lessor to the tenants. The net result of this argument, in other words, is nil. Gulf Life would still have to properly notify F.F. Holding of the mortgage default.

Gulf Life next argues, ignoring the stipulation entirely, that the owner of the shopping center cannot be the party referred to in the assignment as the "owner of the leasehold estate of the mortgaged premises," because then Gulf Life would be obligated to notify the very party defaulting on the mortgage obligation; and there would be no provision in the assignment for notice to the tenants that they have become obligated to pay rent directly to Gulf Life.[12] Gulf Life contends that such notice to the owner would be futile, and thus could not have been in the contemplation of the drafters of the assignment. Instead, it wants to read the phrase "owner of the leasehold estate" as a loose way of referring *only* to the tenant-lessees of F.F. Holding, such as Wal–Mart, freely substituting the plural "owners" for the singular "owner," as allowed in the assignment.[13] Gulf Life believes that, unless the notice provision is for the purpose of informing the lessees of their altered payment obligation, it would be without any purpose at all. Gulf Life also directs the court's attention to the fact that the other remaining tenants in the shopping center responded to Gulf Life's request to pay rent directly to them, as additional, albeit circumstantial, evidence to support their reading of this provision.

11. The pre-trial order was filed, but the case never proceeded to trial because the parties stipulated that the case should be decided on the basis of the evidentiary record and briefs already submitted to the court. In the Order, filed on August 23, 1995, at ¶ 5 (Stipulations By and Between the Parties), all parties stipulated to the fact that, on the date of the assignment, ITI, the predecessor of TPA, and ultimately F.F. Holding, was the "owner of the leasehold estate of the mortgaged premises." *Id.* at p. 13.

12. Though the parties are jointly bound by the stipulations contained in the pre-trial order, the court will show that, even without that stipulation, Gulf Life's position is without merit.

13. "Wherever used, the singular number shall include the plural...." Plaintiff's Motion for Summary Judgment, Ex. A (Assignment of Leases), at 5.

The court finds this argument also to be without merit, and thus need not even reach the question whether the form of notice to Wal–Mart was adequate.

i.

At the time of the 1972 assignment, the fee in the land held by the Doziers and the leasehold estate held by ITI, the builder of the shopping center and immediate landlord of the tenants there, were separate. ITI was the owner of the shopping center and the lessor to the tenants occupying it. It was in those capacities that it was able to offer two kinds of security for the mortgage it took out, jointly, with the Doziers—the buildings, and the leases to its subtenants. ITI was the co-mortgagor due to its ownership of the improvements and buildings on the land and also as the owner of the leaseholds that served as part of the collateral security for the mortgage. If it were not the owner of such interests, it would have nothing, merely as lessee of the Dozier's land, to offer the mortgagee, whether Hamilton Bank or Interstate Life, as security for the mortgage.

In addition, in the mortgage modification agreement, ITI declared that it was "owner of the leasehold estate in the real estate," and further covenanted that it was "seized of the entire leasehold interest and estate." *On the very same day*, ITI executed the 1972 assignment, where it represented and covenanted that it was "the absolute owner of such leases with full right and title to assign the same." Even though the two documents did not involve exactly and only the same parties, clearly they were executed in order to expedite the very same transaction; and so, the declaration of ITI's interest as "owner of the leasehold estate in the [mortgaged] real estate," in one document, is very strong evidence of its identity as the "owner of the leasehold estate of the mortgaged premises" in the notice provision of the other document.

Furthermore, the next year, ITI leased a portion of the premises to Big–K. That lease defines "lessor" as the "owner[,] *or* the mortgagee in possession for the time being, of the building in which the Leased premises are located, *or* the owner of a leasehold interest in said building and/or the land thereunder." The implication is unmistakable: All of these phrases are different ways of referring the party to whom Big–K's or Wal–Mart's lease obligations run, i.e., its landlord. ITI was, at the very least, the owner of the leasehold interest in the land and the owner of the building. Even if ITI had leased the building to another to operate the shopping center, that party, though it might or might not become the "owner of a leasehold interest in the building," would certainly be the landlord of the tenants therein.

Therefore, in all these documents, "owner of the leasehold estate" and cognate terms are used to identify the person offering the mortgagee a secure interest in the building, with the capacity and responsibility to hold or assign tenant leases in the building. It matters not a whit whether the tenants could themselves ever be described as holding leasehold estates. Those would not, in any case, be the leasehold estates that interested the drafters of these documents.

When these documents were executed in 1972, there were already leases in existence between ITI and tenants in the building. Though the assignment allows for free substitution of the singular and plural cases, if the sole reference to the "owner of the leasehold estate of the mortgaged premises" had the various tenants as its object, the use of the singular "owner" would be peculiar. Also, if the tenants were intended, the linkage of "ownership of the leasehold estate" to "the mortgaged premises" would be superfluous and irrelevant. The only possible reason for this linkage is that both phrases refer to and identify the same party—ITI, which took out a mortgage on the premises in which it owned a leasehold interest. The phrases "said building and/or the land thereunder" in the Big–K lease, "the mortgaged premises" in the assignment, and "the real estate" in the modification agreement, are synonymous. The "owner of a leasehold estate" in those is the same in all cases.

Also, there could be no worse example of draftspersonship than to refer, in one and the same document (the assignment), to the lessor as the "absolute owner of [the] leas-

es,"[14] and yet to the lessee-tenants as the "owner of the leasehold estate."

As a general, linguistic matter, a lessor holds a greater interest in an estate than its lessee. If the lessee nonetheless could be described as the owner of that leasehold estate, where would that leave the lessor? Likewise, an owner must have some valuable title to property that it purports to own, such as can be conveyed to another for consideration. Thus, a lessor who, in exchange for valuable consideration, grants a lease over premises to a tenant, in a sense, can be thought of as an owner who has conveyed part of an estate to that tenant, the lessee. But the tenant thereby comes to "own" only what it can, in turn, convey title over to another party—usually, very little indeed, and only hyperbolically, an "estate," leasehold or otherwise.[15] The "owner of the leasehold estate of the mortgaged premises" thus identifies the lessor—the party whose interest serves as collateral security for the mortgage, whether it is the original mortgagor or one of its successors or assigns.

ii.

The disputed clause in the 1972 assignment goes on to refer to the last owner of the leasehold estate "on records with the [mortgagee]," because that is the party against whom the mortgagee might eventually have to seek its remedy for default, by suspending that party's right, as landlord, to continue to collect rents from its tenants.

Under applicable contract law principles, it would be odd indeed to read the assignment as referring to the tenants, because "the effectiveness of an assignment does not depend upon the assent of the obligor.... When notice of assignment is given to the obligor, it is not necessary that he should promise the assignee that he will perform." 4 A.Corbin, Corbin on Contracts § 870 (1964), at p. 474. Notice is due, however, from the mortgagor to the obligor, not from the mortgagee. According to the Alabama Code as well, no assent by an obligor is required to effect an assignment of contract rights of this nature,[16] and no particular formality is required to serve as sufficient notice by the mortgagor of such an assignment to the obligor.[17]

Neither of the parties to the original 1972 assignment would be protected in any way by requiring suspension of the mortgagor's rights to collect rent, in favor of the mortgagee, to be conditioned on registered mail or personal service notice to each of the tenants. The tenants were not parties to the assignment, and had no right to disaffirm it so long as the burden of their obligations remained essentially unchanged. Contracting parties may certainly provide for specific forms of notice in order to protect their own rights and interests in the contract; but it is immaterial to the relationship between these parties that tenants would, as a separate matter, be protected against claims by the mortgagee for rent paid to the mortgagor until tenants receive notice of the assignment.[18]

14. *"The Assignor* covenants and represents that said Assignor now *is the absolute owner of such leases* with full right and title to assign the same and the rents ... to become due...." Plaintiff's Motion for Summary Judgment, Ex. A (Assignment of Leases), at p. 4 (emphasis added).

15. The cases Gulf Life cites in favor of the proposition that the lessee is the owner of the leasehold estate are entirely inapposite and unconvincing. *Fairhope Single Tax Corp. v. Rezner,* 527 So.2d 1232 (Ala.1987), concerns a lessee's right to set the price for sale of improvements to the leasehold specifically reserved to lessee under the lease; likewise, *State Highway Dept. v. Lawford,* 611 So.2d 285 (Ala.1992), concerns compensation for value, such as profits, lost to a business holding a leasehold estate due to condemnation. Brief in Support of Plaintiff's Motion for Summary Judgment, July 12, 1995, at p. 7.

16. "Every conveyance of an estate in any hereditament, corporeal or incorporeal, is good and effectual without attornment of the tenant; but no tenant who has paid his rent without notice of such conveyance is liable therefor." 1975 Ala. Code § 35–4–32 (Michie 1975).

17. "The claim of the landlord for rent and advances, or for either, may be by him assigned; and the assignee shall be invested with all the landlord's rights, and entitled to all his remedies for their enforcement." 1975 Ala.Code § 35–9–33 (Michie 1975). In Alabama, assignments may be by parol, by mere delivery of the rent note, or by appropriate words in a mortgage. *Bennett v. McKee,* 144 Ala. 601, 38 So. 129 (1905). It is not required that an assignment be recorded. *Id.*

What is the purpose of the notice clause then, if it is not to inform the tenants/obligors that they must now pay rent to the mortgagee? The purpose is to serve notice upon the mortgagor that the mortgagee has elected the remedy of collecting rents from the tenants upon default, as opposed to entry and possession, or foreclosure, and is authorized to take that remedial action to protect its interest under the mortgage without anything further. The notice memorializes the fact that default has occurred and that the right to effect this remedy may presently be exercised. It thus protects both parties.

■ In addition, there is no privity of contract or estate between the mortgagee and the tenants. On the other hand, the mortgagor/landlord and its tenants do have privity of contract and estate, which contract provides, and which grant of estate covenants, that Wal-Mart, the tenant, must continue to pay rents to the landlord until notified otherwise by the landlord.[19] Gulf Life's contention that notifying the landlord would be futile and ineffective is thus incorrect. It is incumbent on the landlord, after such notice, to notify in turn the tenant of a change in its rental payment obligation as a result of an assignment. Notice by the mortgagee, who is not a party to the lease contract, is not sufficient to modify that duty to pay rent under the contract; the tenant would still be obligated to perform towards the landlord until the landlord releases it from that obligation in one manner or another (here by notice of assignment of its right to collect rent to the mortgagee). There is therefore no support for the idea that the mortgagor and mortgagee must or would contract between themselves that tenants should receive notice of the assignment as a condition precedent to its effectiveness.

Wal-Mart had every right, therefore, to protect itself. It does not know what the assignment holds, as between its landlord and the mortgagee, nor is it obligated to know, or to place its trust in representations by the mortgagee. Whether a default has occurred in the mortgage, triggering the assignment, is not Wal-Mart's concern. Nor would a cure of that default be. If and when a cure takes place, whose duty would it be to so notify Wal-Mart, so that it could resume paying rent to the landlord? The assignment is ominously silent on this point. And who would protect Wal-Mart, should it pay rent to the mortgagee, only to discover that its landlord, the mortgagor, disputes whether the assignment has been triggered, and takes action against Wal-Mart, under the lease, for the same rents? Wal-Mart's duty, as a tenant, was simply to abide by its lease. The court concludes that it was reasonable for Wal-Mart to seek to protect itself by continuing to pay rent to its landlord until it received assurances from the landlord that an effective assignment released it from such obligation by transferring the rights to receive payment to Gulf Life. Wal-Mart, the tenant, should not be placed in the position of having to evaluate the merits, validity, and effectiveness of an assignment contract to which it was not a party, at its own risk. Thus, delivery of copies of the assignment contract to Wal-Mart by Gulf Life had no effect upon Wal-Mart's obligation. While it is true that Wal-Mart failed to observe TPA's instructions to forward rent to F.F. Holding, that oversight caused no additional harm to Gulf Life, and was independent of the issues in this case. Whether TPA or F.F. Holding received the rents had no effect whatsoever on the claims of Gulf Life.

Furthermore, although the assignment had attached to it a schedule of then-current lessees, whose rents would be subject to assignment, nothing in the assignment requires the mortgagor to continually or regularly furnish the mortgagee with updated records of current tenants; on the other hand, it is entirely logical and likely that the mortgagee would maintain records of transfers, assigns and successions to the interests of the other contracting party, who would

---

18. See supra note 16 (§ 35-4-32).

19. "Lessee . . . is directed to make rents payable to the order of [Lessor], until Lessee is directed to otherwise by Lessor." See Brief in Support of

Wal-Mart's Opposition to Plaintiff's Motion for Summary Judgment and Counter Motion for Summary Judgment as to Gulf Life, filed Aug. 11, 1995, at p. 4.

thus be the most recent owner of the leasehold estate "appearing on the records of the [mortgagee]."

Finally, if the obligation of Wal–Mart to pay rent to the mortgagee could be triggered merely by the notice clause in the assignment, the attornment that Big–K, Wal–Mart's predecessor, executed several years later would have offered no consideration to Interstate Life, Gulf Life's predecessor, in exchange for granting Big–K a right of quiet occupancy. Instead, the attornment did convey Big–K's assent to pay rent directly to Interstate Life in the event of its foreclosure upon the mortgage on the shopping center.

For all these reasons, the court finds that the only reasonable and plausible referent of the phrase "owner of the leasehold estate of the mortgaged premises" in the assignment, viewed in light of the plain meaning and purpose of the assignment and related documents, and in an attempt to read them consistently, must be the mortgagor and the successors to its interests in the mortgaged property. That is F.F. Holding.

### B.

Gulf Life was obligated to notify the current record owner of the leasehold estate of its election to pursue the remedy provided for in the assignment. Since that party was not Wal–Mart, the question of whether actual notice to Wal–Mart may substitute for formal notice, as noted earlier, need not be addressed at all. But did Gulf Life inform the record owner?

■ As mentioned earlier, Gulf Life wrote to both TPA and F.F. Holding, informing both that a default on the mortgage had occurred and that further action to protect its interests would be taken unless that de-

fault were immediately cured. The letter to F.F. Holding, for example, states: "If we have not received full payment within ten (10) days of your receipt of this letter, we will commence whatever action necessary to protect our interest." This communication neither expressly nor constructively satisfied the notice provision in the assignment, in that it was general, prospective, and indefinite. It was therefore not notice of an actual and present election of the specific remedy of substituting itself for the landlord as the recipient of rents from tenants from that moment forward. Nor was the fact that other tenants, upon receiving notices from Gulf Life similar to Wal–Mart's, paid rent directly to Gulf Life, any form of constructive notice to F.F. Holding, let alone proof to Wal–Mart of the assignment's validity. The next notice from Gulf Life to F.F. Holding, sent six months after the "warning" letter quoted above, concerned its intention to foreclose.

### C.

■ The notice required in the assignment was not a mere formality, and Gulf Life's failure to notify F.F. Holding of its election of remedies was not a trivial one, because the assignment was not self-executing upon occurrence of the condition of default.

The law concerning the immediate effectiveness of a rent assignment that is conditional upon nonpayment of an underlying debt is not singularly clear.[20]

Because the law in this area does vary considerably from state to state—with some courts, for example, even holding that actual taking of possession of the mortgaged premises is required before an assignment of

---

**20.** If an assignment that makes mortgagee's rights to collect rents conditional upon nonpayment of a debt is "an effective present assignment," determined by the date of the assignment contract and not by the happening of the condition of default, 4 A. Corbin, Corbin on Contracts § 875, pp. 509–510 (*see also In Re Allied Products Co.*, 134 F.2d 725 (6th Cir.1943) (conditional present assignment takes priority over subsequent creditors without notice of the assignment)), then once the condition occurs, surrender of rights to the mortgagee would be "without

any reservation whatsoever." 4 A. Corbin, Corbin on Contracts § 876, p. 514. *See also* Rest.2d, Contracts, § 320 (assignment of conditional rights). Thus, unless the contract stipulates otherwise, the right to collect might not be conditional upon further notice. This reasoning would apply directly to the situation of assignment of right to rents by a defaulting mortgagor. But this contract clearly does stipulate otherwise, and so Gulf Life wisely never alleges that no notice was ever required, once the default occurred, before it had a right to seek its remedy.

rents may become effective [21]—a review of relevant case law will be helpful in determining what the full implications of Gulf Life's failure to notify F.F. Holding properly are.

■ The court believes that the law in Alabama supports Wal–Mart, in that an assignment of leases for purposes of securing a collateral interest against the possibility of a mortgage default is not an effective present assignment, but instead requires further action to perfect that security interest before·it becomes effective as a remedy. That is precisely what the clause in the assignment contract, requiring the mortgagee to take actual possession or provide service of notice in person or by registered mail, would provide. The failure to take such additional steps as required by the contract, under Alabama law, means that Gulf Life's right to collect rents directly from Wal–Mart never became effective and Wal–Mart was fully justified in continuing to make good faith payments to its landlord of record.

Case law on this issue is scant. In *Home-Corp. v. Secor Bank*, 659 So.2d 15 (Ala.1994), the assignment of rents clause in a mortgage agreement explicitly stated that the assignment was intended to be an absolute present assignment and not merely the passing of a security interest. An absolute assignment of an interest, contingent upon the occurrence of a condition of uncured default, existed. But the rents assignment did in any case require notice to the mortgagor before it would become effective.[22] In *HomeCorp.*, the mortgagee, upon default by the mortgagor, did provide written notice by letter to the mortgagor of the latter's uncured default and its intention to pursue its remedy of taking receipt of rents thereafter. *Id.* at 20. The court in that case supported *HomeCorp.* on those grounds. This was exactly what Gulf Life failed to do here.

In *Jim Davis v. Albuquerque Fed. Savings & Loan*, 536 So.2d 55 (Ala.1988), the landlord

executed a "conditional assignment of leases and rentals" alongside its mortgage, assigning all rents due under its leases, while reserving the right to collect the rents until default. The mortgagee was protected against precisely the situation found in this case by including within the assignment a clause that *made written notice to the tenants conclusive proof of landlord's grant of authority to the mortgagee* under the agreement to collect those rents. *Id.* at 59. Conclusive proof of Gulf Life's authority is just what Wal–Mart did not have, under the terms of this assignment, by notice from Gulf Life directly. The court in *Davis* pointed out that notice to the tenants was not a condition to the effectiveness of the assignment as such, since, as noted, under 1975 Alabama Code § 35–4–32, such attornment of the tenant is unnecessary in any case. But even though the court said that no further action vis-a-vis the tenant was required to perfect the mortgagee's interest in the rent, it read the remainder of the assignment provision as not requiring any notice to the mortgagor before it became divested, through default, of its conditional right to continue to collect rents. In fact, the provision for notice to the tenants as conclusive proof of landlord's grant of authority to the mortgagee to begin collecting rents was an effective waiver of any such requirement of notice to the landlord. Without that provision, this court believes, the *Davis* court would have had to decide the same question that is presented here. In *Davis*, the mortgagee did, in any case, take further steps to perfect its interest by proceeding to foreclose on the property at the same time as it sought to exercise its right to collect rents.

A recent Alabama bankruptcy case, *In Re Turtle Creek*, 194 B.R. 267 (Bkrtcy.N.D.Ala. 1996), makes the distinction between an absolute assignment and a collateral security assignment of rents decisive for determining whether a mortgagee can proceed to collect

**21.** Paul P Dalcy, et al., *Rents: When Are They Cash Collateral?*, 370 Prac.L.Inst. (Real Estate) 773 (April–June 1992), at 6.

**22.** *HomeCorp.*, 659 So.2d at 18. The mortgage deed said that "mortgagor shall have the right to collect such rents ... prior to or at any time

there is *not notice* of an event of default under this Mortgage...." *Id.* (emphasis added). There, notice was seemingly agreed upon for the protection of the mortgagor, which is reasonable and consistent with this court's understanding of the analogous provision in the assignment that is the subject of this case.

rents without taking further action to enforce its rights against a defaulting mortgagor.[23]

The court in *Turtle Creek* found that a clause in the mortgage indicating that the assignment was given "for the purpose of securing the prompt payment of the indebtedness" meant that it was merely a collateral assignment to secure the mortgages. *Turtle Creek*, 194 B.R. at 278. Thus, "some action by the mortgagee is required after the uncured event of default by the mortgagor occurs before the mortgagee shall be entitled to enforce its interest in rents." *Id.*

In this case, the assignment is very clear that the mortgagee is to take the rents as additional collateral security for payment of the underlying debts.[24] By this reasoning, it would be more accurate to consider this agreement one of collateral assignment of security, than one of absolute assignment of a present interest. By failing to take further action to enforce its rights against the mortgagor and its successors (i.e., TPA and F.F. Holding), Gulf Life failed to take such action as would perfect its right to collect rents directly from the tenant, Wal–Mart, and cannot now be found to complain against Wal–

Mart for payment to its landlord. Gulf Life did not invoke the assignment because it never gave proper notice to F.F. Holding of its election to collect rents under the assignment, nor did it take any other action that would perfect its right during the time period in question.

### D.

Because the court concludes that Gulf Life's motion for summary judgment against Wal–Mart is due to be denied, and that Wal–Mart's counter motion for summary judgment against Gulf Life should be granted, it is not necessary to consider further the contentions between Wal–Mart and third-party defendant TPA. Both TPA's motion for summary judgment against Wal–Mart and Wal–Mart's counter motion are therefore due to be denied as moot.

An appropriate judgment will be entered.

**23.** In *Turtle Creek*, the court wrote:

"Although the law in Alabama is relatively undeveloped on this issue [of whether a rental assignment is absolute or requires additional action to perfect], the Court believes that a mortgagee is required to take an additional step such as foreclosure, sequestration of rents, or by having a receiver appointed to collect the rents, or some similar action in order to perfect a lien in rents generated by a mortgagor's property in Alabama.

"Some Courts take the position that an assignment of rents clause transfers the present legal right to rents to the mortgagee subject to a condition precedent that it shall take effect [only] upon default. This is known as an absolute assignment of rents. Other courts hold that an assignment of rents clause simply creates a security interest in the rents, i.c., a collateral or conditional assignment of rents. The distinction is significant. If the assignment of rents is determined to be absolute, the rents are outside of the estate and the creditor may simply collect such rents.... If, however, the assignment of rents is a collateral assignment, the mortgagee may be required to take some affirmative action to enforce or perfect its security interest. Such affirmative acts include taking possession of the subject property, or filing an action to enforce the assignment. *A close reading of the assignment of*

*rents is required to distinguish an absolute assignment from a collateral assignment.*"

*Id.* at 277–78 (citations omitted) (emphasis added) (reading *HomeCorp.* as providing explicitly for an absolute assignment of rents and not merely the transfer of a security interest).

**24.** From the assignment:

"To have and to hold the same unto the Assignee, and to the successors and assigns of the Assignee forever as additional collateral security for payment of the principal and interest and other sums provided to be paid [under the mortgage note]."

Plaintiff's Motion for Summary Judgment, Ex. A (Assignment of Leases), at p. 1. And:

"It is expressly understood and agreed by the Assignor (Independent Troy) and the Assignee hereof that said assignor reserves and is entitled to collect said rents, income and profits upon but not prior to their accrual under the aforesaid leases and to retain ... the same unless and until the Assignor defaults in the performance of the terms ... of said mortgage...."

*Id.* at 2. The assignment goes on to state that once any default is cured, the parties would be restored to their original positions, and upon payment of all indebtedness secured the assignment would become void. *Id.* at 3.